# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### June 3, 2008 Session

# TIMOTHY TERELL MCKINNEY v. STATE OF TENNESSEE

### Appeal from the Criminal Court for Shelby County
#### No. P-26860        Arthur T. Bennett, Judge

---

### No. W2006-02132-CCA-R3-PD   -   Filed March 9, 2010

---

The Petitioner, Timothy Terell McKinney, appeals from the judgment of the Shelby County Criminal Court denying his petition for post-conviction relief. In July 1999, a Shelby County jury found the Petitioner guilty of first degree murder and attempted second degree murder. For the capital conviction, the jury sentenced the Petitioner to death. The trial court imposed a sentence of twelve years' confinement for the attempted second degree murder conviction and ordered that it be served consecutively to the sentence of death. The Petitioner's convictions and sentences were affirmed on direct appeal by the Tennessee Supreme Court. See State v. McKinney, 74 S.W.3d 291 (Tenn.), cert. denied, 537 U.S. 926 (2002). On November 4, 2002, the Petitioner filed a pro se petition for post-conviction relief. The Office of the Post-Conviction Defender was appointed to represent the Petitioner. Evidentiary hearings on the petition were conducted on various dates in January and February 2006. On appeal to this Court, the Petitioner presents the following claims: (1) trial counsel was ineffective for agreeing to a consent order regarding discovery materials; (2) trial counsel was ineffective for failing to confront Debra Kimble with her prior statement; (3) trial counsel was ineffective for failing to prepare for trial and present evidence favorable to the Petitioner; (4) trial counsel was ineffective for failing to investigate mitigating circumstances adequately; (5) trial counsel was ineffective for failing to introduce residual doubt evidence; (6) the prosecution denied the Petitioner a fair trial; (7) the exclusion of the Petitioner's eyewitness expert at trial violated his right to present a defense; and (8) the death penalty is unconstitutional and in violation of international treaties. We conclude that the Petitioner was deprived of the effective assistance of counsel at both the guilt and penalty phases of the trial. Accordingly, the judgment of the post-conviction court is reversed and the matter is remanded for a new trial.

**T.R.A.P. 3 Appeal as of Right; Judgment of the Criminal Court Reversed; Case Remanded**

JOSEPH M. TIPTON, P.J., delivered the opinion of the court, in which ALAN E. GLENN and D. KELLY THOMAS, JR., JJ., joined.

Paul J. Morrow, Jr., Nashville, Tennessee, James W.B. Benkard, Benjamin Allee, Alexandra Parra, Courtney Howard, Thomas M. Noone, New York, New York, for the appellant, Timothy Terell McKinney.

Robert E. Cooper, Jr., Attorney General and Reporter; Michael E. Moore, Solicitor General; Mark E. Davidson, Senior Counsel; William L. Gibbons, District Attorney General; and John Campbell, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**


**Factual Background**

The facts underlying the Petitioner's conviction are set forth in our supreme court's opinion:

> On the night of December 25, 1997, the victims, Donald Williams and Frank Lee, were working as security guards for Crumpy's, a nightclub in Memphis, Tennessee. Both Williams and Lee were off-duty Memphis police officers.
>
> The defendant, Timothy McKinney, was attending a party at the nightclub. Later that night, the defendant, who was wearing a black derby, multi-colored sweater, gold vest, dark pants, and gold shoes, left the club and became upset when he could not find his car in the parking lot. Although Williams and Lee assured him that his car was in the parking lot, the defendant screamed, "My car's been stolen, somebody's going to pay for it, or I'm going to come back and shoot up the club or blow it up." Williams urged the defendant to calm down and stop making threats. The defendant replied that "he didn't care about going to jail" because he had just finished serving twenty-three months.

Shortly thereafter, a friend of the defendant's, Yarron Young, came out of the club and found the defendant's car in the parking lot. While Young was outside, Lee separated the defendant and Williams. Young testified that the defendant was speaking loudly and was drunk, and that he heard the defendant say he would "be back." Another witness, Stephon Spencer, talked to the defendant near his car. The defendant told Spencer that "he had gotten into it with a security guard" and that the guard had hit him. Spencer did not see any sign that the defendant had been injured.

The defendant then drove out of the parking lot, but later returned and tried to re-enter the club. Lee told the defendant that he was not permitted back into the club and offered to go inside and find his friends. The defendant refused the offer and instead waited outside the club beneath a light pole. Lee testified that the defendant "just sat there and looked at us all night." Williams called the Memphis Police Department and requested that a patrol car investigate. Although the defendant eventually left, he returned yet again and parked his car in the lot.

Memphis police officer Ronald Marshall arrived at the scene on an unrelated matter, and Williams spoke to him about the defendant. When McKinney again tried to enter the club, Officer Marshall stopped him, placed him in a patrol car, and asked him why he had returned to the club. The defendant told Marshall that he "did not want any trouble." Marshall took the defendant's driver's license and gave it to Williams, who wrote down the defendant's name, date of birth, and address. When Williams said that he did not want an arrest to be made, Marshall told the defendant to leave the scene, and he complied.

Joyce Jeltz testified that later, around 2:30 or 3:00 a.m. on the morning of December 26, she saw a man running toward Williams and Lee with a gun against his right leg, and she saw the man shoot Williams "point blank in the back of his head." Jeltz said that the man was wearing brown pants and an unbuttoned vest. She later selected two men from a photographic array whom she believed could have been the shooter; one of the men was the defendant.

-3-

Lee testified that he heard the gunshot, saw Williams on the ground, and then saw the defendant "eye to eye" from a distance of five or six feet in the well-lighted area. Although the defendant had a gold bandana over the lower part of his face, he still wore the multi-colored sweater and dark pants. Lee pursued the defendant and exchanged gunshots with him before the defendant drove from the scene in the same vehicle he had been using throughout the evening. Lee later identified the defendant from a photographic array, specifically pointing to his "lazy" or "droopy" eyes, and he testified that he had "no doubt" that the defendant was the shooter and the man he had chased from the scene.

Williams was given CPR at the scene and then transported to the hospital. The gunshot to his neck had transected his spine, resulting in paralysis and an inability to breathe. Williams was placed on an artificial ventilator and contracted pneumonia and other infections. He died on January 29, 1998.

After the shooting, on December 26, 1997, the defendant went to Stephon Spencer's house and told him, "They said I shot a police officer." Thereafter the defendant telephoned his parents and two lawyers, but then left Spencer's home. On December 27, 1997, police officers found the defendant at a Memphis apartment. Later that day, officers found the defendant's hat, sweater, vest, and vehicle license plate inside his girlfriend's house. Ballistics tests later revealed particles of gunshot residue on the defendant's vest.

Although the defendant did not introduce any evidence at trial, he challenged the identification testimony of Lee and Jeltz and attempted to develop an alibi defense. The jury, however, convicted the defendant of the first degree premeditated murder of Donald Williams and the attempted second degree murder of Frank Lee.

## Sentencing Phase

After the conviction of McKinney for the premeditated first degree murder of Donald Williams, the trial moved into the sentencing phase for the offense. In sentencing, the State relied upon the aggravating circumstance in Tenn. Code Ann. § 39-13-204(i)(2) (1997), *i.e.,* that the defendant had a prior conviction for a felony whose statutory elements involved the use of violence to a person. The State introduced evidence to show that the defendant had pled guilty to aggravated robbery on May 1, 1994 in Memphis, Tennessee.

The offense of aggravated robbery, in pertinent part, is the intentional or knowing theft of property from the person of another by violence or putting the person in fear, accomplished with a deadly weapon or by display of any article used or fashioned to lead the victim to reasonably believe it to be a deadly weapon. *See* Tenn. Code Ann. § 39-13-402(a) (1997). The indictment to which the defendant pled guilty had charged that the defendant and a co-defendant "violently" robbed the victim.

In addition to evidence of the prior violent felony aggravating circumstance, the State presented victim impact evidence. First, the victim's widow, Sharon Williams, testified that the personal and financial loss suffered by her and her two daughters had been "devastating." The children were eight and ten years of age when the victim was killed.

Memphis police officer Michael J. Clark then testified about the victim's career as a police officer from 1982 until his death. Clark said that Williams spent most of his career in uniform patrol and had served as interim vice-president of the Memphis Police Association. Clark also said that Williams was a member of the association's negotiating teams, and he described Williams as a "mediator," rather than a "big, let's lock 'em up, policeman.'" Clark told the jury that Williams had worked to obtain a school security assignment, which required a four-year college degree.

The defense then presented the testimony of numerous family members and friends who described the defendant's background and characteristics. For example, Tawanda Waterman testified that she was pregnant with the defendant's child in December of 1997, but had lost the child. Waterman said that the defendant had intended to marry her and "start his life over."

The defendant's mother, Ella Tyrus, testified that she was fifteen when she gave birth to the defendant. She said that the defendant was a good artist and was good at helping old people, and she asked the jury to spare his life. The defendant's stepfather, J.C. Tyrus, testified that the defendant, one of thirteen children, was a normal boy who had caused no problems and who got along well with his siblings. Tyrus said that the defendant had dropped out of school in the eighth or ninth grade, but was a good artist. When Tyrus also stated that the defendant had been trying to turn his life around, the prosecutor cross-examined him about the defendant's juvenile adjudications for aggravated assault in 1991.

Steven and Linda Moshier testified that they were friends and co-workers of the defendant and that the defendant was a good worker. Linda Moshier stated that the defendant was great with children and avoided confrontations. Zacharias Stewart, a childhood friend, also testified that the defendant had a great personality and introduced a drawing that the defendant had done.

Dr. John V. Ciocca, a clinical psychologist, testified that he interviewed the defendant and reviewed his school records. Dr. Ciocca said that the defendant had low learning ability in reading, writing, and mathematics. The defendant had a "low average" IQ in the lower 90s and had been placed in special education when he was nine. According to Dr. Ciocca, the defendant's learning disability, lethargy, and despondency at a young age revealed a need for psychological help that he never received. The defendant was expelled from school in the ninth grade, but later completed the requirements for a G.E.D. in 1994.

The defendant then took the stand and testified that he was the father of two children, both of whom had died. He also said that he had learning problems in school and got bored easily. The defendant admitted that he had been drinking and smoking marijuana on the day of the offenses, but he denied that he killed Donald Williams and accused the State's witnesses of lying. Although the defendant admitted that he served time for aggravated robbery, he said that he had only driven a getaway car while a co-defendant committed the robbery. The defendant testified that he attained his G.E.D. while he was in prison in 1994. He admitted that he had juvenile adjudications for aggravated assault, but minimized his role in those incidents.

After the evidence was completed, the case was submitted to the jury for sentencing. The jury found that the defendant's prior conviction for aggravated robbery satisfied the aggravating circumstance relied upon by the State, see Tenn. Code Ann. § 39-13-204(i)(2) (1997), and that the evidence of this aggravating circumstance outweighed evidence of mitigating circumstances beyond a reasonable doubt. Accordingly, the jury imposed the death sentence upon Timothy McKinney for the first degree murder of Donald Williams.

McKinney, 74 S.W.3d at 298-301.

## Proof at Post-Conviction Hearing

At the post-conviction evidentiary hearing, the following proof was presented: Donald Ray Crump owned Crumpy's Comedy Club in 1997, in addition to numerous hot wing stores. The club was located at Hollywood and James Streets and the building could accommodate four hundred people. Mr. Crump stated that Frank Lee, a Memphis police officer, and he had attended college together. After opening the Comedy Club, Mr. Crump hired Frank Lee as a security guard. Frank Lee "put together [a] team [of] four or five officers to work. . . ." The security team was to watch the parking lot and they would also escort employees carrying the stores' deposits at closing time.

Mr. Crump testified that on December 25, 1997, Magic Clippers, a barber shop, held a private party at Crumpy's Comedy Club. The manager of the club, Hayward Brown, made the arrangements with Magic Clippers. Mr. Crump stated that although he had not originally intended to attend the party, he decided it was in his business interest to do so. He arrived

-7-

at the Comedy Club about 9:30 p.m. He estimated that approximately three hundred people were at the Magic Clippers' party. Mr. Crump noticed that Frank Lee and Officer Eugene Ross were working security at the club. As the crowd grew larger, Frank Lee informed Mr. Crump that another security guard was needed. Mr. Crump called Officer Don Williams to work security.

Mr. Crump testified that toward the end of the evening, he asked a man to leave the club. Mr. Crump identified the man as being about 5'10" and dressed in casual attire. The man had been stumbling around earlier in the evening, and Mr. Crump had advised the barstaff not to serve this man any more alcohol. Mr. Crump later observed this man having a conversation with Officer Don Williams in the parking lot. Officer Williams was in the process of calling the police to have the man arrested. Mr. Crump intervened and stated that he did not want to see anyone arrested on Christmas night. Mr. Crump directed Officer Williams to let the man go home. Two police cruisers arrived, but they left when Officer Williams advised them to disregard the call.

Mr. Crump testified that he was inside the club when he heard shooting outside. He stated that customers started running back into the club and someone stated that Officer Williams had been hit. Officer Lee later reported to Mr. Crump that he had chased the suspect.

Mr. Crump testified that he was in the neighborhood when the Petitioner was arrested. Mr. Crump owned a restaurant three blocks away from where the Petitioner was arrested. Mr. Crump spoke with one of the officers at the scene. He advised the officer that the man that he had thrown out of the club earlier that evening was not the Petitioner. Mr. Crump stated that no one from the Petitioner's defense team ever spoke with him. On cross-examination, Mr. Crump admitted that he did not know about whom Officer Williams was speaking in the parking lot.

Peter Hayward Brown, Mr. Crump's uncle, testified that he and Mr. Crump were business partners. He added that he also acted as the manager of Crumpy's Comedy Club. On Christmas night 1997, Mr. Brown testified that he mainly stayed at the bar. He added that it would be impossible to see across the room when the club was crowded. Mr. Brown added that the party was a bring-your-own liquor affair. He stated that the bar served beer and "setups."

Mr. Brown testified that Frank Lee, Don Williams, and Eugene Ross were working security at the Comedy Club on the night of the Magic Clippers' party. Mr. Brown could not recall hearing any shots. He did recall that some people ran back into the club reporting shots outside. Mr. Brown hesitated, looked outside, and saw Officer Williams lying on the ground.

He and a friend, who happened to be a registered nurse, went outside to assist Officer Williams. Mr. Brown could not recall giving a statement to the police on the night of the shooting. He said no one from the Petitioner's defense team ever contacted him.

Kevin Robinson, a barber at Magic Clippers in 1997, testified that he was involved in the planning of the Christmas party. He said he was responsible for taking tickets from people at the door for about four hours. Mr. Robinson said he left the party at approximately midnight and returned about 2:00 a.m. He stated he was not present when Officer Williams was shot.

Mr. Robinson testified that he knew the Petitioner. He grew up with the Petitioner's brothers and sisters in the same neighborhood. He recalled seeing the Petitioner at the party and described the Petitioner as happy. Mr. Robinson classified the Petitioner as a friend. He was aware that the Petitioner had been released from prison earlier that year.

Mr. Robinson recalled other disturbances at the party. He recalled one man being rowdy at the door. He said that this man was ultimately escorted from the club by the security guards. Mr. Robinson identified this man as "Goldie." He stated that Goldie was drunk. Mr. Robinson said Goldie and the Petitioner had a similar build.

Frdrick Ross, a barber at Magic Clippers in 1997, testified that knew the Petitioner as both a neighbor and as a customer. Mr. Ross stated that he was involved with two others in funding the party at Crump's Comedy Club on December 25, 1997. Mr. Ross testified that he worked the door at the party. Mr. Ross stated that after the shooting occurred, he stepped outside and saw Officer Williams on the ground about two feet from Ross' car. He stated that he had no idea who had been involved in the shooting. The following week, he heard through "barber shop talk" that Patrick Johnson had been involved in the shooting. Mr. Ross said that he was never asked to provide a statement to police officers and that no one from the defense team spoke with him.

John Mason testified that he and the Petitioner grew up together in the same neighborhood and attended school together. Mr. Mason said that the Petitioner "was alright to me" and that the Petitioner "was cool." Mr. Mason attended the Christmas party at Crump's Comedy Club. He said he was not at the club at the time of the shooting. Mr. Mason did recall seeing the Petitioner at the club. He stated, "We was all intoxicated."

Mr. Mason testified that he later learned that a police officer had been shot. He also said that he learned from Patrick Johnson that the Petitioner did not shoot the police officer. Mr. Mason testified that Patrick Johnson stated that "he did it and just laughed like it was a joke." Mr. Mason said he heard from several other neighborhood sources that Patrick

-9-

Johnson was the shooter. Mr. Mason said he was never asked to provide a statement to police and no one from the defense team spoke with him.

On cross-examination, Mr. Mason testified that he had "drank about half a pint" before going to the Christmas party. He conceded that the Petitioner was drinking when he saw him at the party. Mr. Mason further admitted that he never came forward with the information that Patrick Johnson had admitted to shooting Officer Williams, despite the fact that the Petitioner was being charged with the crime.

Jason Shorter testified that he was present at the Magic Clippers' Christmas party at Crumpy's Comedy Club. He arrived at the party between 9:00 and 10:00 p.m. He said no police cars were in the parking lot when he arrived. He noticed two security guards standing at the door. He knew one as Officer Williams and the other as Officer Frank Lee. Mr. Shorter said he was aware that the security guards were armed. He said one of the officers would pat down people entering the club and check them before they were allowed to enter.

Mr. Shorter testified that the dress was casual, but no blue jeans or tennis shoes. Mr. Shorter recalled leaving the club while escorting a female friend. Mr. Shorter saw Officer Williams on his left side. He then saw somebody walking up behind him. This person shot Officer Williams at least three times. Mr. Shorter ducked and took cover by a car. He described the ensuing scene as chaotic. He said he saw the shooter run to the alley and heard a couple of shots.

Mr. Shorter stated that to the best of his recollection, the shooter's gun was not an automatic, but a revolver. He identified the shooter as being dressed all in black. He said the shooter may have had a "fade, not real high but a fade." The shooter may have had a mustache, slim build, about 5'10". Mr. Shorter said the police never contacted him for a statement and no one from the Petitioner's defense team contacted him.

On cross-examination, Mr. Shorter testified that he was intoxicated at the time he was leaving the club. He said that in his opinion, his female companion was similarly intoxicated.

London Lee testified that he knew the Petitioner. He stated that the two men met in junior high school and that they had been friends ever since. Mr. Lee also attended the Christmas party at Crumpy's Comedy Club in 1997. He said the security at the party "was like plain clothes security." He said he was not patted down when he entered the club. Mr. Lee described an encounter at the party when an "obnoxious and boisterous" man bumped against him. After this encounter, Mr. Lee determined that the party was getting out of hand and it was time for him to leave. He recalled the time being approximately 12:30 or 1:00 a.m. Mr. Lee left the party before the shooting. He was later informed that there was a

shooting at the club. Mr. Lee described the Petitioner as "a calm type person." He said he did not believe that the Petitioner was the shooter. He said that no one from the Petitioner's defense team contacted him.

Sonia Stiger, London Lee's sister, testified that she knew the Petitioner as a friend of her brother. Ms. Stiger also attended the Christmas party at Crumpy's Comedy Club. She reiterated the incident her brother had with the intoxicated guest bumping into him. She described this man as wearing a twill jacket and slacks. Ms. Stiger said that she stayed at the party until about 1:45 a.m. On cross-examination, she stated that they left the club before the shooting occurred.

Febbre Lashell Berry testified that he attended the Magic Clippers' Christmas party but that he did not learn about the shooting of Officer Williams until after the party. He recalled seeing the security officers but could not identify them by name. Mr. Berry said there was an incident where the security guards had to throw someone out of the club. He said this guest was wearing a blue jean jacket. Mr. Berry could not recall being asked to write a statement for police officers after the shooting. He said no one talked with him about the case.

Larry Springfield, an entertainer and singer, testified that he performed at the Magic Clippers' Christmas party on December 25, 1997. His band performed in connection with a DJ and a comedian. Mr. Springfield recalled three security guards, one outside and two inside the club. He said that at some point during the evening there was "a ruckus outside." He looked outside and observed Officer Williams handling somebody. He could not tell to whom Officer Williams was speaking. Mr. Springfield said that the security guard was asking the person to leave and that there was no physical altercation between the two. Mr. Springfield described the man as wearing a light colored shirt. He observed the man leave in a light-colored vehicle. Mr. Springfield said he left the club before Officer Williams was shot. He said there were no officers on the scene at the time he left.

Mark Lester testified that he attended the party at Crumpy's Comedy Club and that he was present when Officer Williams was shot. He had to stay at the club after the shooting, and police brought him back to his home. He explained that he could not recall the events because he had been drinking all day. Mr. Lester acknowledged that he provided a statement to police regarding the events occurring at the club. He could not recall whether he testified at the Petitioner's trial.

Derrick Devaughn Boyd testified that he attended the party at Crumpy's Comedy Club accompanied by Rosalyn Reliford, his first cousin, and her sisters. The group arrived at the party at approximately 10:00 p.m. He said that security guards were present at the entrance

and that he was searched by Officer Williams before entering the club. During the party, Mr. Boyd observed a man being "put out of the club." This incident occurred while Lester Bibbs, the comedian, was performing. Mr. Boyd could not recall the identity of the person being evicted from the club. Mr. Boyd said he left the party between 1:30 a.m. and 1:45 a.m. At this time, the security guards were involved in a matter at the front. He also observed a lot of people leaving. He said the security guards were directing traffic. He also recalled seeing a police car.

Anthony Sledge testified that he did some work as a security guard at Crumpy's Comedy Club. Mr. Sledge said he was not at the club on the night that Officer Williams was murdered. Mr. Sledge testified that he and A.C. Carter would provide security on the inside of the club. He explained that they greeted customers, frisked them, and searched them to make sure no weapons were being brought into the club. Officers Lee, Williams, and Ross were responsible for security on the outside of the club, the cars and the exterior boundaries of the club. Mr. Sledge said the security guards would wear Crumpy's security shirts.

Mr. Sledge stated that the club did not have a regular liquor license. The establishment was a bring-your-own-liquor club. Patrons were searched in order that they did not bring anything into the building that the club sold, like orange juice. The club had a two item minimum. Mr. Sledge testified that after the shooting, the club "went to a quick demise." He said he was never contacted by anyone from the Petitioner's defense team. He explained, however, that he was not at the club on the night of the incident.

Cassandra Turner, an employee of the Memphis City Schools, testified that she knew Officer Don Williams in a professional capacity. She explained that she worked as a basketball coach and as an assistant principal. Because of her positions, Ms. Turner would contact police officers to work security. She said the police officers were in uniform when they provided security services.

Ms. Turner testified that she attended the Christmas party at Crumpy's Comedy Club. She arrived at 10:00 p.m., but she was unable to leave until 3:00 or 4:00 a.m. because of the shooting. Upon her arrival, she recalled that Officer Williams was showing people where to park. Ms. Turner also knew Officer Lee and spoke with him briefly. Ms. Turner testified that at some point in the evening, she saw Officer Williams and another person dragging a man out of the club. She estimated that thirty-five to forty minutes after this incident, the shooting occurred. The crowd was notified of the shooting because Officer Lee entered the club and stated that Officer Williams had been shot. Ms. Turner said the police would not let anyone out of the club. Ms. Turner said she did not know who had shot Officer Williams.

Ms. Turner testified that the police asked her questions and conducted a follow-up call. She told police officers that she did not know who had shot Officer Williams. She was contacted by "some company," but she could not recall the name. She was not contacted to testify at trial. She later said that the company that contacted her may have been Inquisitor, Inc.

Paulita Jones attended the 1997 Christmas party at Crumpy's Comedy Club with her friend Alicia Thomas, arriving before midnight. She recalled two security guards outside and one in the inside at the door. The guards wore black shirts, black pants, and black boots. Ms. Jones did not learn of Officer Williams' murder until the next day on the news. Ms. Jones did recall that a gentleman was drunk and was thrown out of the club.

Hershell Harts testified that he attended Magic Clippers' Christmas party at Crumpy's Comedy Club, arriving about 8:30 or 9:00 p.m. He said that the parking lot was not crowded and that he was able to park near the door. Mr. Harts stayed at the party until the end. He said that he was inside the club when the shooting occurred. He was unable to leave because the police had a crime scene ribbon around his car. He said that he was not detained by the police but that he only could not leave in his own vehicle. Mr. Harts was not approached by police officers. He said he had left the building before the police had gone into the building. He admitted that it was logical that the police officers did not know that he had been in the building earlier.

Tead Manning testified that he and the Petitioner grew up in the same neighborhood and attended school together. Mr. Manning said he attended the Christmas party at the comedy club in December 1997. He stated that he met Officer Williams a few weeks before the party at a high school basketball game. Mr. Manning stated that he did not leave the club until about 5:00 a.m. the following morning. He was present when Officer Williams was shot, but he did not hear any gunshots fired. He said that he happened to be near the door when Officer Williams was shot and that he assisted the nurse administering CPR to Officer Williams. He was never contacted by anyone from the Petitioner's defense team.

Kesha F. Davis testified that she attended the Christmas party at Crumpy's Comedy Club, arriving between 9:30 and 10:00 p.m.. She said that she noticed Officer Williams and two other men doing security work. At some point in the evening, the club lights were turned on and the party-goers were asked to leave. As Ms. Davis and Stacy Williams were leaving, Ms. Davis noticed the "flashing lights" of police cars, and they were escorted to the exit by the security guards. She said they were unaware that there had been a shooting. Ms. Davis was not questioned and went directly to her car. She said she was never contacted by law enforcement or the defense team regarding the events at the club.

Dana Armstrong attended the Christmas party at Crumpy's Comedy Club with her brother, who was employed by the Shelby County Sheriff's Department. She said that during the party, an intoxicated patron pushed her. Ms. Armstrong later saw security asking this patron to leave the premises. She said the man was upset and obviously did not want to leave the party.

Marcus Alexander testified that he was at the Christmas party. Mr. Alexander knew Officer Lee. During the party, Mr. Alexander saw security take one man from the dance floor. He described the man as "light-skinned, about six-two, had a brown tan hat on, flashy clothes, matching outfit." Mr. Alexander was inside the club when the shooting occurred. He recalled that Officer Lee said the shooter was light-skinned.

William McKinnie testified that he attended the Magic Clippers' Christmas party with his wife and her friend. Mr. McKinnie said he grew up with Officer Marshall. At the party, he met up with Officer Marshall and Reginald Lambert. He said the party was crowded. Officer Marshall was in and out of the club because he had to go to work. Officer Marshall introduced Mr. McKinnie to Officer Don Williams. Mr. McKinnie said he was standing outside when Officer Williams was shot. He said he and "Stefan" were talking outside the club. While the two men were talking:

> that's when Terry walked up behind him with Tim [McKinney] and told him, you know, let's go like that. And we was standing in the main doorway and they walked down to the end of the building to the right, to my right, and he told – he said to Stefan, he said, man, the car is gone, like that. . . .
>
> . . .[Timothy McKinney] walked down to the end of the . . . building. And he said that – he told Don [Williams], he said if my car don't turn up, he said you going to pay, you going to pay or the owner of this club is going to pay. He said somebody going to pay tonight, just like that.

Mr. McKinnie recalled Officer Williams asking the Petitioner for a description of his vehicle. The Petitioner responded that he drove a burgundy Cutlass. Officer Williams informed the Petitioner that they had not seen any car leaving the lot. Mr. McKinnie then returned to the club.

Ten minutes later, Mr. McKinnie went back outside the club, observed that Officer Marshall had returned, and saw Officer Williams on the ground. He did not recall hearing any gunshots while inside the club.

-14-

Clifford Robinson, a dispatcher for the Memphis Police Department, testified that he attended the Christmas party at Crumpy's Comedy Club. Although he noticed that there were two security guards at the club, he did not know either one. Mr. Robinson knew the Petitioner, having grown up in the same neighborhood. Mr. Robinson was not aware of the shooting until he was at the door and saw Officer Williams lying on the ground.

Mr. Robinson testified that he was interviewed by the Memphis Police Department. He said he was in a group photograph with the Petitioner that was taken that night at Crumpy's Comedy Club. He stated that he told the police "information about a gentleman by the name of Patrick." He recalled that "[Patrick] and [the Petitioner] got to the club together that night." Mr. Robinson was told to be at the Petitioner's trial, but he was never called as a witness.

Mr. William Gosnell and Mr. James Ball represented the Petitioner at the trial level. William Gosnell, William Massey, and Brock Mehler represented the Petitioner on appeal. Mr. Gosnell testified that half of his legal practice was criminal defense work. The technical record of the Petitioner's case reflects that Mr. Ball and Coleman Garrett were appointed to represent the Petitioner on February 13, 1998. Mr. Gosnell was not appointed until June 24, 1998. The Petitioner's trial was Mr. Gosnell's first death penalty case. He said that Mr. Ball was designated lead counsel. At the time of his appointment, Mr. Gosnell said that he had not attended any death penalty seminars but that he did familiarize himself with the ABA Death Penalty Guidelines. Mr. Gosnell explained that his duties were to "assist [Mr. Ball] at the trial," to prepare a pre-trial motion for change of venue, and to work on the jury questionnaire. He said Mr. Ball was the person directing the actions in the case.

Mr. Gosnell testified that the trial was originally scheduled for October 5, 1998, but that a continuance was granted until February 8, 1999. He said that at the time of the trial, Mr. Ball was suffering from tachycardia and was in and out of the hospital. Despite this illness, Mr. Ball remained in contact with Mr. Gosnell during this time. The case was rescheduled for July 12, 1999. During the Petitioner's trial, Mr. Gosnell cross-examined six witnesses and presented the direct testimony of Dr. John Ciocca during the penalty phase.

Mr. Gosnell conceded that he was not involved in the discovery process, which was completed before his appointment. He said he was aware that Mr. Ball had asked the court for funds for the services of both Dr. Ciocca and Inquisitor, Inc. Mr. Gosnell stated he had weekly or bi-weekly meetings with Ms. Glori Shettles and/or Ms. Banks, investigators with Inquisitor, Inc., during which they would bring information or counsel would discuss what they needed the investigators to do.

Regarding the theory of the case, Mr. Gosnell testified that the guilt phase defense was that "the victim was shot and that there was very little evidence as to who committed this crime, so the defense for the Petitioner was mistaken identity or that essentially that he was not the person who committed this crime." Mr. Gosnell conceded that, under this theory, it was important to note where the Petitioner was at all times relevant to the shooting. He recalled that witness Charles Goin could not recognize anyone on a photograph spread sheet dated December 26, 1997. He said this would be helpful if the prosecution later used this information to identify the Petitioner. He stated that it would be useful in cross-examination.

Mr. Gosnell testified regarding the various descriptions of the assailant. He stated that Karen Melissa Thornton described the perpetrator as a black male, age 29 to 32, 5'9", 155 to 170 pounds, slim, skinny face, dark skin, wearing black turtleneck sweater and dark pants or jeans. Mr. Gosnell stated that trial testimony described the perpetrator as wearing a vest or a sweater. He stated that Joyce Elizabeth Jeltz was an eyewitness to the crime. During the trial, Ms. Jeltz identified the perpetrator as wearing a dark knit turtleneck sweater pulled over his nose and mouth. Ms. Jeltz identified the perpetrator as wearing a gold vest and multi-colored sweater. Ms. Jeltz also failed to identify the perpetrator from a lineup. Mr. Gosnell said that he cross-examined Ms. Jeltz during the guilt phase of the trial. Mr. Gosnell said that there was no description of a perpetrator wearing a gold vest or multi-colored sweater.

Mr. Gosnell testified that the defense team had received information that Patrick Johnson may have been involved in the shooting. He said a statement to police by John Mickens mentioned a "Patrick or a Pat" as having something to do with the murder of Officer Williams. Mr. Gosnell added that "Pat" was described as a black male, 6' tall, medium complexion, twenty-one to twenty-four years of age, short hair, fade on the side, taller on top, 165 to 180 pounds. He recalled that they had asked Inquisitor, Inc., to investigate Patrick Johnson. Mr. Gosnell believed that if Patrick Johnson was not mentioned at trial, it must have been due to the lack of any information that would have been of substantial assistance to the Petitioner.

Mr. Gosnell stated that Officer Williams did not die at the scene. He said Officer Frank Lee was one of the main prosecution witnesses at trial. He recalled Officer Lee recounting an earlier encounter at the club with a guest identified as the Petitioner. Mr. Gosnell said that Officer Lee testified that the Petitioner came out of the club an hour before the shooting and could not find his vehicle. The Petitioner thought that his vehicle had been stolen from the parking lot. Later, the proof revealed that one of the Petitioner's friends had used the vehicle and moved it to a different location. Officers Lee and Williams called for squad cars to come to the scene as a result of the Petitioner's disturbance. By the time the police cars arrived, the Petitioner had already left the scene. The Petitioner later returned and

attempted to re-enter the club. Officer Williams asked for his identification and wrote down his driver's license number. Mr. Gosnell said that this information was later retrieved from Officer Williams' pocket after he was shot. He said that Officer Lee described the perpetrator as 5'9" to 5'10 ½"; 150 to 165 pounds, black male, mid-twenties, no facial hair, multi-colored sweater, black derby hat, and a sweater made of some kind of a yarn material, not that bulky; had circular designs around the arms and around the body, and there were gold, yellow, red and a gold sleeveless leather vest, black or blue trousers, Hush Puppies orange or orange/gold. This was the description of the person who had thought his car had been stolen. Officer Lee later described the shooter as a black male, 5'9" to 5'10 ½", 150 to 165 pounds, a black t-shirt, black pants, orange or gold Hush Puppies like shoes with an orange bandana around his mouth, no hat.

Mr. Gosnell testified that the Petitioner's vehicle was described as a Delta 88, maroon or burgundy with a lighter gray vinyl top. Mr. Gosnell said that the Petitioner's vehicle was sold at auction long before the trial. He could not recall any discussion about the disposal of the vehicle and the fact that evidence was possibly destroyed.

Mr. Gosnell testified that Inquisitor, Inc. generated a witness list of approximately 99 persons. The defense team then began whittling down the list, eliminating people who knew nothing about the case. They began with the premise that someone at the club could establish that the Petitioner was inside the club at the time of the shooting. He said that this task was futile. Although a lot of people could place the Petitioner inside the club, they were unable to pinpoint what time he left.

Mr. Gosnell conceded that the bulk of the money for Inquisitor, Inc.'s services was spent on the guilt phase of the trial. He acknowledged that he was aware that Officer Lee was "written up as a result of being [at the club as an off-duty officer]." He did not know why Mr. Ball did not use this information to impeach Officer Lee's testimony. Mr. Gosnell stated that they did not receive dispatch logs before trial. He said they were operating under the time line that the incident with the Petitioner happened at 12:30 a.m. but that the shooting did not occur until 2:30 a.m. The dispatch logs indicate that the police were dispatched to the scene at 1:25 a.m. and the last car departed at 2:01 a.m. Mr. Gosnell said they requested the dispatch logs but never received them. Mr. Gosnell said they also requested the Internal Affairs folder of Officer Frank Lee but never received it. Mr. Gosnell stated that a shooting time of 2:30 a.m. was consistent with testimony at trial.

Mr. Gosnell testified that it appeared that both Officer Frank Lee and Officer Don Williams were working as off-duty officers without permission. Mr. Gosnell conceded that there were numerous inconsistencies with Officer Lee's trial testimony and his responses to the Internal Affairs investigation. The basis of Officer Lee's reprimand was that he had no

permission to be there off-duty and that he was using a police-issued firearm. Mr. Gosnell stated that Officer Marshall's testimony that he arrived at the club at 12:45 a.m. was inconsistent with his trial testimony that he was at the club between 1:00 a.m. and 1:30 a.m. He also admitted that if the dispatch logs showed that squad cars were actually called to the scene somewhere around 1:18 a.m., and "all cleared" about 2:01 a.m., such would place Officer Marshall at the scene after 2:01 a.m., essentially changing the whole time line of the prosecution and the defense theory of the case.

Regarding the selection of Dr. Ciocca as an expert witness, Mr. Gosnell testified that he had no input into his selection. He said that Dr. Ciocca was a neuropsychologist and records were supplied to him to review for mitigation purposes. The records were supplied by Glori Shettles, a mitigation specialist with Inquisitor, Inc. Dr. Ciocca reviewed the Petitioner's school records; results of some psychological testing when the Petitioner was nine, eleven, and fifteen; an IQ test; and a Woodcock-Johnson test score. Dr. Ciocca did not have access to the Petitioner's birth records or his juvenile records. Mr. Gosnell was unaware of Dr. Ciocca's making any inquiry into the Petitioner's drug and alcohol history.

On cross-examination, Mr. Gosnell acknowledged that Mr. Ball had forty years of trial experience. He described their professional relationship as good, stating that they worked well together. He said that Mr. Ball would visit the Petitioner on Saturdays or when he was doing his jail visits. Mr. Gosnell testified that Mr. Ball established a good rapport with the Petitioner. Mr. Gosnell stated that during their meetings with the Petitioner, they would explain how the trial was going to proceed but that the most important decision was deciding whether or not the Petitioner would testify. The Petitioner decided against testifying at the guilt phase. The Petitioner testified during the penalty phase.

Mr. Gosnell testified that Inquisitor, Inc., was retained by the defense team to assist in trial preparation and that Mr. Ball dealt with the investigators. He said Glori Shettles worked on the mitigation evidence, while Denise Banks and Ron Lax worked on the guilt phase investigation. Mr. Gosnell stated that "by and large the lay witnesses . . . were not helpful because they were either inside the club and didn't see any of the events that transpired or they had already left the club and didn't see any of the events that transpired."

Mr. Gosnell testified that the Petitioner provided the names of his girlfriend and some other people to Mr. Lax. He stated that Mr. Ball and Mr. Lax were the persons who interviewed the Petitioner and asked for input as to potential witnesses. He stated that during the penalty phase of the trial, the Petitioner said he was at his girlfriend's home and not at the crime scene. The Petitioner's girlfriend told Mr. Gosnell that "she was awoken and she talked with him briefly." She said that she went back to sleep and that when she got up the next morning, he was gone. Mr. Gosnell concluded that her testimony was of "extremely

-18-

limited value" and did not "seal up an alibi defense for him." From his own testimony, the Petitioner placed himself at his girlfriend's home at 2:15 a.m. However, there was no evidence to corroborate that the Petitioner was there at 2:30 a.m. when the shooting occurred. Mr. Gosnell stated that the Petitioner's girlfriend did not give them the time frame to establish a more substantial alibi. While he conceded that he had heard the rumor that Pat Johnson was the actual shooter, Mr. Gosnell said that Mr. Lax made inquiry into the rumor but that the defense team was unable to establish any proof to support the rumor. He said he would not have introduced a rumor into evidence. He stated that there must have been some foundation to the proposed evidence for its admission but that, in his opinion, the Pat Johnson rumor was inadmissable.

Mr. Gosnell testified that they were aware that Officer Lee was involved in a disciplinary proceeding as a result of his unauthorized work as a security guard at Crumpy's Comedy Club. He testified that the defense team attempted to have the services of an eyewitness expert authorized by the trial court but that the request was denied. The defense team did engage an expert, Raymond Cooper, regarding the gunshot residue. Mr. Cooper was provided the findings of the State's expert. He did not dispute their findings. Mr. Gosnell testified that no independent testing was done on the evidence. He stated that independent testing would have harmed the Petitioner's case had Mr. Cooper found gunshot residue.

Mr. Gosnell testified that Glori Shettles of Inquisitor, Inc., was in charge of the mitigation aspect of the investigation. He could not recall Ms. Shettles ever saying that she could not find school reports or other specific documents. Mr. Gosnell stated that the services of Dr. Ciocca were retained to evaluate the Petitioner. Dr. Ciocca indicated that the Petitioner had a low learning ability of reading, writing, and mathematics. The Petitioner had a low average IQ in the lower 90s. Mr. Gosnell said that Dr. Ciocca diagnosed the Petitioner with a learning disability, lethargy, and despondency at a young age and surmised that the Petitioner had psychological needs that were never met. Ms. Shettles also discussed the Petitioner's home life and circumstances with his family members. Mr. Gosnell said that his plan during the penalty phase was to paint a picture of a young man with problems, a young man with a close family. He was attempting to establish that a sentence of life in prison would be a sufficient punishment for the Petitioner.

Ronald L. Lax, the owner of Inquisitor, Inc., testified that he had been in business since August 1978. In 1997, he had approximately twelve to fifteen employees. The firm was retained to perform investigation on the Petitioner's case, with him, Glori Shettles, Danese Banks, and Alyson Frazier assigned to work on the case. Alyson Frazier was responsible for gathering records and locating individuals. Glori Shettles was the mitigation investigator, and Danese Banks was the guilt phase investigator.

Mr. Lax testified that he was contacted in February 1998 by J.C. Tyus, the Petitioner's stepfather. Mr. Tyus was referred to Inquisitor, Inc., by another attorney. Mr. Lax stated that Mr. Tyus did not have sufficient funds for a retainer fee. Later, Inquisitor, Inc., was contacted by one of the Petitioner's appointed attorneys. Mr. Lax said he first met with Mr. Ball on April 29, 1998, regarding the Petitioner's case.

Mr. Lax testified that they would prepare a time line, based on their discovery review, their interview with the Petitioner, interviews with witnesses, and other documents. He explained that there would be a guilt phase time line and a mitigation time line. Mr. Lax testified that in order to prepare a proper death penalty investigation, Inquisitor, Inc. would normally need $20,000 to $25,000. The trial court granted Inquisitor, Inc. $1,000 for the investigation. He said that Mr. Ball never requested a certain monetary amount from the trial court. Mr. Lax stated that Inquisitor, Inc.'s, normal rate for an indigent case at the time of the Petitioner's investigation was $65 per hour.

Mr. Lax accompanied Mr. Ball to the District Attorney General's Office to review discovery material. He said they did not see much during the open file discovery. They were not permitted to look at the files independently. Mr. Lax knew of the disciplinary file of Officer Frank Lee. He said Officer Lee was reprimanded for working as a security guard without prior approval and for firing his service revolver at the suspect. Officer Lee's service file reflected his admission that he had worked only one night at Crumpy's Comedy Club. Mr. Lax said he never was able to obtain the Internal Affairs records of Officer Frank Lee.

Mr. Lax testified that Joyce Jeltz, an eyewitness to the shooting, was interviewed by Alyson Frazier. During this conversation, Ms. Jeltz described the shooter as "male black, approximately 5 foot 10, thin build, weighing 175 to 180 pounds." She described the gunman as wearing a brown sweater which appeared to be a turtleneck and dark pants. She stated that the gunman had a low hair cut. Ms. Jeltz saw no vest or jacket, and she did not mention orange shoes.

Mr. Lax testified that in early September 1998, he met with Mr. Ball and identified twenty investigative tasks Inquisitor, Inc., determined needed completing. This was done approximately one month before the first trial date. Items in this list included subpoenaing police logs and dispatch tapes, obtaining color photographs of the lineups, and obtaining expert witnesses to compare skid marks. These items were never obtained. Mr. Lax identified other expert witnesses that might have been helpful to the Petitioner's defense. These requests were never discussed with defense counsel. He also requested that the defense team request exculpatory evidence. Mr. Lax advised Mr. Ball when requested items had not been turned over to the defense, including the photographic lineup. Mr. Lax stated

-20-

that he believed Mr. Ball was reluctant in insisting upon this evidence because the Assistant District Attorney General was a friend of his. Mr. Lax said that Mr. Ball was unorganized and unprepared for their meetings.

Mr. Lax testified that Patrick Johnson developed to be a possible suspect responsible for the murder of Officer Williams. This rumor was never supported by proof other than witnesses who said that Patrick Johnson was in the area of Crumpy's that night. Mr. Lax said that he attempted to locate the Petitioner's vehicle, a 1984 Oldsmobile, but that it was sold on March 3, 1998. Mr. Lax did not obtain this information until October 8, 1998. The vehicle had been impounded December 27, 1997.

Mr. Lax stated that he had gathered information that would call into question the testimony of Officer Lee. He said there was some question as to the distance that Officer Lee was from the shooter, which questioned Officer Lee's identification. He said the descriptions of the shooter's clothing provided by other witnesses did not match the description of what the Petitioner was wearing that night. Mr. Lax stated he did not interview Mr. Crump, but he admitted that he should have.

Mr. Lax said that in October 1998, he wrote to David Keefe, the head of the Capital Division of the Public Defender's Office, asking for additional help. Mr. Lax said he believed they were not getting the discovery he felt was there, including exculpatory evidence, and that there was no movement from Mr. Ball. On this same date, Mr. Lax wrote a letter to Mr. Ball expressing his concerns over these same matters and requesting that Mr. Lax be relieved or terminated from the case. He also complained that they had not received payment and had several outstanding bills. On November 2, Mr. Lax discussed the matter with Mr. Ball. He said that when he did not hear from Mr. Ball again, he spoke with the trial judge. Mr. Lax said that in his opinion, trial counsel were not prepared for their meetings with Inquisitor, Inc. He said that he suggested that counsel file an interlocutory appeal to garner the discovery items they had not received but that Mr. Ball rejected this idea.

Mr. Lax testified that Judge Dailey approved the following funds for their services: $1,000 on April 8, 1998; $5,000 on May 13, 1998; $10,000 on August 3, 1998; and $7,311. Mr. Lax stated that $23,311 had been approved and that they had billed $24,125.

Danese Banks, an investigator with Inquisitor, Inc., worked as the guilt phase investigator on the Petitioner's case. She requested that defense counsel subpoena the police logs and dispatch tapes from the night of the shooting. She also requested that they obtain the files of Officers Lee and Williams. In her opinion, the police logs and dispatch tapes were essential in creating a timeline of events.

Ms. Banks said she interviewed the Petitioner's girlfriend, Debra Kimball. She said Ms. Kimball stated that the Petitioner arrived at her apartment at 2:15 a.m. Ms. Banks said that in her opinion, Ms. Kimball's statement established an alibi for the Petitioner. However, while the Petitioner stated that he and Ms. Kimball "were together intimately that night," Ms. Kimball refuted this statement. Ms. Kimball stated that she went to bed in the bedroom and that she assumed that the Petitioner slept on the couch.

Ms. Banks said she also interviewed Dana Armstrong. She said that Ms. Armstrong described an altercation within the comedy club involving an intoxicated man who was removed from the club. Ms. Armstrong described the man as "medium complexion," "lighter than Angela Bass," 5'10" or 5'11", with a mustache, short black hair but not too low, kind of clean, with a khaki or brown blazer. Ms. Banks said she also interviewed Charles Goin, the audio engineer that night at the comedy club. She testified that Mr. Goin stated that he was loading equipment outside of the club and actually saw something of the shooter. Mr. Goin described the shooter as "approximately 5 feet 9 inches, medium build, wearing dark clothes, and dark skinned." Ms. Banks said that Mr. Goin was unable to select anyone matching the description out of a police photograph lineup as he only saw the shooter from the back.

Ms. Banks testified that she had a conversation with Officer Ronald Marshall during which Officer Marshall stated that he was at the club twice on the night of the shooting. Officer Marshall said he dropped off his cousin Reginald Lambert at the club. He then returned to the club because he had Lambert's keys. On this second visit, he talked with Officer Williams about the Petitioner. Ms. Banks said that Officer Williams indicated that the Petitioner was drunk and that he told Officer Marshall to let the Petitioner leave.

Ms. Banks said she attempted to get an affidavit from Mike's Auto Plex regarding the Petitioner's vehicle. She could not recall whether she received an affidavit, but she did state that they were never able to get the car. She said they wanted to obtain Crumpy's Comedy Club's records in order to get information about Officer Williams and the other security guards who were working on the date of the shooting. They were unable to obtain these records.

Ms. Banks stated that it was the position of the investigators that the police focused on the Petitioner because of the altercation with the security guards earlier that night. She said there were other altercations throughout the night.

Memphis Police Sergeant John McClain testified that he was assigned to the General Investigations Bureau in 1997. In the course of his duties, he was asked to go to the jail to see and photograph the clothes the Petitioner was wearing when he was booked into jail.

Sergeant McClain said that the photograph of the Petitioner's clothing indicated a multi-color sweater, a black hat, and a gold vest.

Dr. Pamela Auble, a psychologist, was retained by the Petitioner's post-conviction attorneys to evaluate the Petitioner. As part of the evaluation process, Dr. Auble reviewed the Petitioner's juvenile records, school records, and medical records. She also considered the mental health records of the Petitioner's paternal aunt, Margret McKinney, and the Petitioner's maternal aunt, Everleen Fleming. Dr. Auble further reviewed the Tennessee Supreme Court's opinion in the Petitioner's direct appeal, Shelby County jail records, memoranda of interviews with the Petitioner conducted between January 2003 through March 2004, interviews with family members, and Dr. Ciocca's records and trial testimony. Dr. Auble also considered the special education records of the Petitioner's half-sister, a genogram, and a report of Dr. Murray Smith.

Dr. Auble testified that she interviewed the Petitioner at Riverbend Maximum Security Institution in Nashville over four days in April 2004. She said she spent approximately twelve hours and forty-five minutes interviewing the Petitioner. During these visits, Dr. Auble administered the Wechsler Adult Intelligence Scale (WAIS), Third Edition, which is an intelligence test. She also administered the Wechsler Memory Scale, Third Edition, which is a test of ability to learn and remember new information. To determine whether the Petitioner was "faking memory problems," Dr. Auble administered the Test of Memory Malingering. Other tests administered to the Petitioner included the Booklet Category Test (a test of mental flexibility and the ability to form and test hypotheses), the Delis Kaplan Executive Function System (designed to measure frontal lobe functioning or mental flexibility, conceptual flexibility), Halstead-Reitan Trailmaking Test (measure of attention and mental flexibility), Control Oral Word Association (a language test measuring verbal fluency), the Boston Naming Test (ability to name common objects), the Finger Oscillation Test (test of motor speed), and the Woodcock Johnson Test of Achievement Third Edition (test of achievement of school learning). Dr. Auble explained that this battery of tests was often used in neuropsychological evaluations.

Dr. Auble stated that the Petitioner was cooperative with her testing and interviewing. During her evaluation process, Dr. Auble learned that the Petitioner's mother, Ulla Tyus, was one of thirteen or fourteen children. She said there was a history of "some mental illness" existing in the Petitioner's mother's family. "His mother is described by her family members . . . as having periods of seizures and also as having had some hallucinations where she sees things that aren't really there." Dr. Auble said that the Petitioner's mother had never been treated for any mental illness. Ulla Tyus' older sister, Everlean, had a history of depression and psychotic episodes, including hallucinations. Margaret McKinney was also treated for depression and has reported psychotic symptoms such as hallucinations and delusions. In

addition to the history of mental illness, Dr. Auble also learned that there was a history of alcoholism. Family members with reports of alcoholism included Walter McKinney and Everlean McKinney. The oldest sibling, Roy Wilson, reported that "most of his siblings had histories of alcoholism or drug abuse." Dr. Auble reported a family history of low intelligence. Three of the Petitioner's half-siblings had been diagnosed with mental retardation.

Dr. Auble testified as to numerous facts relating to the Petitioner's family background. Her testimony is summarized as follows:

> Ulla Tyus gave birth to the petitioner when she was nineteen years old. She had been pregnant twice before having the petitioner. Ulla Tyus became involved with J.C. Tyus when the petitioner was two years old. At that time, he had four children living with him. J.C. Tyus and Ulla Tyus had five more children together.

> The petitioner was born in Memphis. His mother had not received any prenatal care during her pregnancy. At the time of the petitioner's birth, Ulla Tyus had an infection of the uterus. The petitioner's Apgar Score was only a three at one minute; most children receive a score of nine or ten. This low score indicated that he had a heart rate, but was not breathing; he was of abnormal color and he did not have reflexes. At five minutes, the petitioner's Apgar had improved. He had a little bit of muscle tone, he had some reflexes, but he was still not breathing.

Dr. Auble stated that "research . . . indicates that it puts children at risk for later problems." She explained that the

> . . . brain is the organ that consumes more oxygen than any other organ in your body. And if you're not breathing, your brain is not getting oxygen. And so not breathing for five minutes is a long time for a brain to be without oxygen.

She added that the lack of oxygen, in other words, can result in brain damage.

Dr. Auble continued:

The petitioner's developmental milestones during his childhood were normal. However, at twenty-three months, the petitioner was reported to have delayed language. He was further reported to have an inadequate diet. In school, the petitioner did not do well. He had trouble learning to read. The petitioner ended up repeating the first grade. In the third grade, the petitioner was referred for an evaluation by the school system for Special Education. At this time, the petitioner obtained a full scale IQ of 92, which is in the lower portion of the normal range. Although in the third grade, the petitioner's achievement test results indicated a second grade level in reading and math, and a first grade level for written language. The petitioner was diagnosed with a learning disability and placed in Special Education. The petitioner was in Special Education classes between 1985 and 1989. The petitioner's performance in the special education class improved.

When the petitioner was in the seventh grade, he was charged with malicious mischief resulting from his firing a BB gun at another boy's buttocks. This issue was resolved with a warning and counseling. In February 1990, the petitioner was arrested for possession of marijuana with intent to sell and possession of cigarettes. These issues were resolved with supervised probation. He was later arrested due to truancy. In July 1990, the petitioner was arrested for robbery. This charge was later dropped. In March 1991, the petitioner was arrested for evading arrest, criminal trespassing and truancy. In April 1991, the petitioner withdrew from school. The petitioner was charged with aggravated assault, unlawful possession of a weapon, and criminal attempted felony. At some point after these incidents, the sixteen-year-old petitioner was sent to Wilder Youth Center. The petitioner remained at Wilder for ten months.

Dr. Auble testified that the Petitioner informed her that he began smoking marijuana and drinking alcohol between the ages of ten and eleven. The Petitioner smoked marijuana and drank alcohol "[e]very day if he could get it." Wilder Youth Center officials recommended drug and alcohol treatment, but there was no indication that either the Petitioner or his parents followed up on this recommendation after he left Wilder.

Dr. Auble recited the following facts as to the Petitioner's background:

> In 1993, the nineteen-year-old petitioner was arrested and convicted of aggravated robbery. He received an eight-year sentence of confinement. The petitioner was confined from May 1994 through May 1997 at Northwest Correctional Complex. While at Northwest, the petitioner was interviewed, but apparently he did not provide accurate information. For example, the petitioner said he had never been in special education classes, he had sold drugs for five years, and he had seen people shot in his neighborhood. The prison records from this period of confinement indicated that the petitioner's group intelligence test was in the normal range. He was doing math and reading at the fourth grade level and spelling at the fifth grade level. The records indicated a learning disability. The petitioner "was seen as a member of a sub culture in which promoted illegal activities that was likely to continue after his release." The petitioner was paroled in February 1997. He completed a drug offender's school program in May 1997. The petitioner worked for four months with Kimco Corporation and had a positive drug screen in March 1997. In June 1997, the petitioner obtained employment with Memphis Fence. In December 1997, the petitioner told his parole officer that he was employed at Multiform.

As a result of her testing, Dr. Auble concluded that the Petitioner was not malingering. She stated that the Petitioner obtained a full scale IQ of 88, which was consistent with prior evaluations. Dr. Auble noted that the Petitioner had more difficulties with timed tests. She said that the Petitioner had trouble with attention and concentration. Although she could not definitely reach this conclusion, Dr. Auble noted that the Petitioner's learning difficulties were consistent with persons affected by lack of oxygen early in life. Dr. Auble said the Petitioner's reading level was on par with an eleven or twelve year old child. Dr. Auble provided the following diagnosis of the Petitioner:

> It's my opinion that he has attention deficit, hyperactivity disorder, primarily inattentive type. That's both from my testing and from my record review.
> . . .
> . . . I think it's more a disorder in which he has trouble focusing and keeping track. Something that was noticed in school too.

> Kids who have that usually do better with individual attention
> from the teacher and that was noted.

She noted that the Petitioner had "[c]annabis dependence, marijuana dependence which is in remission. . . . Alcohol abuse . . . in remission." She added that the Petitioner also had a history of learning disorder. Dr. Auble stated that in her opinion, the Petitioner was "a little bit paranoid," but she did not have any testing to support this conclusion.

On cross-examination, Dr. Auble conceded that the Petitioner was not mentally retarded. She conceded that the Petitioner's use of marijuana and alcohol at age ten or eleven coincided with the drop of his performance in school. Dr. Auble stated that to her knowledge, the Petitioner was a street dealer of drugs and that this was the source of the majority of his income. Dr. Auble admitted that she was aware that the Petitioner had a bad temper as a child. She also said he would not back down from a confrontation.

Murray Smith, a doctor specializing in addiction medicine, was retained to evaluate the Petitioner. He reported that the Petitioner began drinking and using marijuana at age eleven. By the age of thirteen, the Petitioner was using marijuana and alcohol on a daily basis. The Petitioner was also involved with "some minor dealing of marijuana." Dr. Smith testified that the Petitioner was later involved in some selling of cocaine, but stressed that cocaine was not a drug that the Petitioner "cared anything about or used." He said the Petitioner's drug and alcohol use were consistent with Dr. Auble's diagnosis of attention deficit hyperactivity. He said that marijuana and alcohol were both sedatives and would calm a person down. He explained that the Petitioner's frustrations at home and at school were sources of frustration that could have led him to marijuana and alcohol.

Dr. Smith testified that alcohol and marijuana slow down brain development. In an attempt to use something that would make him feel better, the Petitioner was actually choosing things that worked against him. Dr. Smith testified that the use of marijuana and alcohol at an early age actually changed the "hard wiring of the brain." The Petitioner received some treatment in 1997 with a DUI court-type class education about drugs and alcohol. Other than this brief treatment, the Petitioner never received any real intensive treatment for his use of alcohol and marijuana.

Dr. Smith said that the Petitioner stated that on the date of the shooting, he started drinking and smoking at 8:00 a.m. Rather than partaking in his usual beer, the Petitioner had "some hard liquor which was not very common for him." Throughout the day, he continued to drink intermittently until he went to the club between 6:00 p.m. and 8:00 p.m. The Petitioner described himself as "tipsy." The Petitioner reported to Dr. Smith that:

-27-

he had gone out to his car, smoked some marijuana, came back into the club, went back to his car and his car wasn't there and he got upset. And because he was upset, the officer came on the scene and that's about as far as we talked about it.

Dr. Smith summarized his diagnoses of the Petitioner as follows:

Mr. McKinney had a chronic use of alcohol and marijuana continuing right up until the event of that Christmas of 1997. That day was different in that he increased his consumption of the marijuana and the alcohol significantly. Enough to make him really note that he was feeling the effects of it. With his underlying problem of attention deficit, his memory for details, his perception of the complete picture was less perfect even than normal. And so he had some blanks about what really was happening, how things happened, what the sequence of events, the true picture that somebody who was not chemically altered . . . and not having the underlying attention deficit problem would have had probably a completely . . . well, a different picture, a different understanding of the situation.

And the thing I was most impressed with was a belief system that Mr. McKinney developed being on the streets when he was an adolescent 12, 13, 14 years old. And that was how suspicious and untrusting he was about other people. . . . And he was suspicious of their motives. So that was a most impressive thing that I came away with after having talked to him in length and time is that he would believe something that was incomplete beyond something that anybody else would say and act on that as if it were real. And that has to do with his belief system that he couldn't trust and that he was suspicious.

Glori Shettles testified that she performed the mitigation investigation in the Petitioner's case for Inquisitor, Inc. She recalled that her work in the Petitioner's case was "very scant as compared to other cases. . . ." Ms. Shettles stated that she had a scheduled meeting with Mr. Ball but that the subject of mitigation was never discussed. She stated that in essence, she had no meetings with Mr. Ball regarding mitigation. Ms. Shettles further explained that although there were court-approved funds expended for investigation, most of these funds went toward investigation for the guilt phase.

-28-

Ms. Shettles reviewed the prepared mitigation time line. The time line started on the date of the Petitioner's birth, July 13, 1974. Ms. Shettles could not explain why she had never obtained the birth records of the Petitioner. She did obtain some of the Petitioner's school records and had some knowledge of his learning difficulties in school. Ms. Shettles could not recall any indication that the Petitioner's drug and alcohol use began when he was eleven. She stated that had she known this fact, it would have been a red flag to ask the attorney to retain an addiction specialist.

Ms. Shettles testified that the Petitioner dropped out of school at the age of sixteen in 1990 and that she did not know why he dropped out of high school nor was she aware that he was sent to Wilder Development Youth Center. She said she had never obtained the Petitioner's records from Wilder. She said one of the Petitioner's former girlfriends, Laquita Williams, described the Petitioner's mother as "mentally slow." Ms. Williams stated that the Petitioner was not abused by his parents but that he received little supervision. Ms. Williams believed that the Petitioner's mother was taking Dilantin. She added that the Petitioner was not a trusting person. Ms. Williams also mentioned the name of Pat Johnson, including the rumor that he was "bragging about the cop getting what he deserved." Ms. Shettles said this information was provided to the attorneys.

Ms. Shettles testified that she interviewed Sharon Marion, the Petitioner's stepsister. Ms. Marion stated that her mother, not the Petitioner's mother, had abandoned the family. Ms. Marion would have testified on the Petitioner's behalf at trial. Ms. Shettles believed that she would have made an excellent witness.

Ms. Shettles testified that a mitigation theme was a strategy. She stated that themes could include mental retardation, borderline intelligence, organic problems, substance abuse, sexual abuse, physical abuse, and the like. The theme could encompass any number of things related to the client, his life, his family background; in other words, any thing that explained how the client got from "here to there." Ms. Shettles believed that lingering doubt could have been a defense theme in this case. She also stated that the Petitioner had a decent institutional record. Ms. Shettles believed that any failure in regard to developing a mitigation case was due to the lack of communication between herself and Mr. Ball.

On cross-examination, Ms. Shettles admitted that her initial step was interviewing the Petitioner. This information was key to developing a background of the Petitioner. Again, she could offer no explanation why the Petitioner's juvenile records from Wilder were not obtained. Ms. Shettles stated that it was possible that the Petitioner never told her about his substance abuse problems.

Everlean Fleming, the Petitioner's maternal aunt, testified that she and the Petitioner's mother, Ulla, were five years apart in age. Their father was a sharecropper, and their mother helped in the field chopping and picking cotton. Although Ms. Fleming had to help in the fields, the Petitioner's mother did not because she watched the smaller children at home. Their childhood home did not have electricity or running water. Ms. Fleming stated that their father drank alcohol and that sometimes he got angry when he was intoxicated. At these times, he would "use bad language" toward their mother. Ms. Fleming added that "all of [her] sisters . . . including [herself]" drank a lot of alcohol. She stated that three brothers drank as well.

Ms. Fleming testified that the Petitioner's mother had a baby when she was fifteen. The baby died, and this caused the Petitioner's mother to be depressed. She said the Petitioner's mother had seizures from worrying and was taken to see a psychiatrist. The Petitioner's mother was given medication for her problem and appeared to be improving. Ms. Fleming said the Petitioner had a good personality when he was a child. She stated that he liked to play with toys and draw and that he liked to go to school.

Wanda Palmer, another of the Petitioner's maternal aunts, testified that she was three years younger than the Petitioner's mother, Ulla. She stated that there were fifteen children in their family. She stated that her father worked at a dairy barn and that her mother worked at a nursery. Their father drank a lot of alcohol. Ms. Palmer did talk with someone from the Petitioner's defense team, most likely Glori Shettles.

Sharon Marion, the Petitioner's stepsister, testified that her father married the Petitioner's mother. She stated that the family lived in a large house, with two bathrooms and four bedrooms. Both parents administered the discipline, but Ms. Marion stated that they "hardly ever got a whipping." Ms. Marion stated that her father could read a little, but the Petitioner's mother could not read at all.

Ms. Marion described the Petitioner as a happy child. She said the Petitioner was a teenager when she moved from the house. She stated that when the Petitioner was released from jail, he "kissed the floor" and said he was never going back to jail.

Ms. Marion recalled that on Christmas Day 1997 the family, including the Petitioner, were at her father's home. They were all playing a game called "Bop It." She described the Petitioner as happy, because this was his first Christmas being out of prison. Ms. Marion said she was interviewed by Glori Shettles. She told Ms. Shettles that she would have testified at the Petitioner's trial if asked. Ms. Marion attended the Petitioner's trial but was never called to testify. On cross-examination, Ms. Marion admitted that the Petitioner used

marijuana and drank alcohol. She explained that she was not concerned because he "wasn't doing it like a drug addict."

Jennifer Stewart testified that she knew the Petitioner through church and that their parents were friends. Ms. Stewart stated that, in her opinion, the Petitioner's family was not as strict as hers. She stated that the kids were allowed to come and go and did not have a curfew. She testified that the Petitioner's stepfather became a preacher later in life and that with this change, his reading improved. Ms. Stewart said that the Petitioner was a talented artist. She said the Petitioner stated upon his release from prison that he was going to stay out of trouble.

Zacharias McGhee, Jennifer Stewart's brother, testified that he was an acquaintance of the Petitioner. He described the Petitioner as being quiet and mild. He recalled that the Petitioner's parents' reading skills were very poor. Mr. McGhee testified at the Petitioner's 1999 trial. He explained that he saw the trial on the television and that he went and found the Petitioner's attorneys. He stated that, in his opinion, the Petitioner was not being accurately portrayed.

Carolyn Whitley, a retired teacher from Snowden Junior High School, testified that she taught a junior high resource class. The Petitioner was a student of hers in the seventh and eighth grades and during the first semester of ninth grade. She stated that special education resources classes were only for three hours a day for certain children, including the Petitioner. She said these students would be phased back into their regular classroom. She explained that ninth grade was remedial and that she mainly just tutored the Petitioner. The Petitioner was placed in the regular math class with Ms. Whitley tutoring him. She stated he did very well, earning a B average. Ms. Whitley described the Petitioner as a very cooperative and respectful student. She could not recall any behavioral problems in the classroom.

Ms. Whitley recalled that the Petitioner's half-sister, Patricia Tyus, was also a student of hers. Patricia Tyus was also learning disabled. Ms. Whitley said Patricia was hardworking and did fairly well in school.

Lieutenant Clarence Cox testified that he was involved in investigating the shooting death of Officer Williams. He noted that the alley behind the club was dark with dim lights. He said that there had been two calls for officers to go to the club; the first at 1:18 a.m. Officer Williams made this call and advised that there was a drunk suspect that kept going to his vehicle. Officer Williams believed that the suspect had a gun. The cars left the scene at 2:01 a.m.

Lieutenant Larry Charnes testified that during the investigation into the shooting of Officer Williams, a female witness mentioned that Patrick Johnson was bragging about having something to do with the shooting. Law enforcement attempted to make contact with Patrick Johnson and spoke with his mother. Another witness, John Mickens, also brought up Patrick Johnson's name, even providing Johnson's pager number. Again, officers attempted to contact Patrick Johnson but were unsuccessful. A third attempt was made to contact Mr. Johnson, to no avail. Lieutenant Charnes testified that Officer Williams did not die until January 29, 1998. The case was then transferred to the homicide division.

Lieutenant Charnes testified that Todd Blackman was stopped driving a vehicle similar to the one driven by the suspect. The vehicle did not match, but Blackman was arrested on unrelated charges. Blackman initially stated that he was not at the party. Lieutenant Charnes later showed Blackman a photograph of the Petitioner and Blackman taken at the party.

Police Director Walter Crews handled the administrative hearing on Officer Lee's reprimand. At the hearing, Officer Lee stated that he thought he would work off-duty for only a short period of time and that had it turned into a long-term engagement he would have completed off-duty documents.

Officer Ron Marshall testified that he was on duty on the night of December 25, 1997. Before roll call, he took his cousin to Crumpy's Comedy Club. After roll call, he had to return to the club to give a key to his cousin. When he returned to the club, he spoke with Officer Williams about the disturbance with the Petitioner. Later that night, he heard that Officer Williams had been shot.

Officer Williams contacted the police department at 1:18 a.m. on December 26, reporting a black male occupying a burgundy Oldsmobile 98 who was threatening to shoot inside the club. Officer Williams indicated that this man was very drunk. Cars were dispatched at 1:21 a.m., and the officers left the scene at 2:01 a.m. At 2:26 a.m., a call was received advising that an officer had been shot in the head at Crumpy's Comedy Club. The suspect was identified as a male black, white cap, black shirt, black pants, and occupying a burgundy Oldsmobile 98.

**Standard of Proof**

Post-conviction relief is warranted when a petitioner establishes that his or her conviction is void or voidable because of an abridgement of a constitutional right. T.C.A § 40-30-103. The petition is governed by the 1995 Post-Conviction Act, which requires that allegations of fact be proven by clear and convincing evidence. See T.C.A. § 40-30-110(f).

"Evidence is clear and convincing when there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence." Hicks v. State, 983 S.W.2d 240, 245 (Tenn. Crim. App. 1998).

Once the post-conviction court has ruled upon a petition, its findings of fact are conclusive on appeal unless the evidence in the record preponderates against them. Wallace v. State, 121 S.W.3d 652, 656 (Tenn. 2003); State v. Nichols, 90 S.W.3d 576, 586 (Tenn. 2002) (citing State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999)). This court may not reweigh or reevaluate the evidence or substitute its inference for those drawn by the post-conviction court. Nichols, 90 S.W.3d at 586. Questions concerning the credibility of witnesses and the weight to be given their testimony are for resolution by the post-conviction court. Id. (citing Henley v. State, 960 S.W.2d 572, 579 (Tenn. 1997)). The burden is now on the petitioner to show that the evidence preponderated against those findings. Clenny v. State, 576 S.W.2d 12, 14 (Tenn. Crim. App. 1978). Notwithstanding, determinations of whether counsel provided a defendant constitutionally deficient and prejudicial assistance present mixed questions of law and fact to be reviewed de novo. Wallace, 121 S.W.3d at 656; Nichols, 90 S.W.3d at 586.

## I. INEFFECTIVE ASSISTANCE OF COUNSEL

### Legal Standard

The Sixth Amendment provides, in pertinent part, that, "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defense." U.S. Const. amend. VI. This right to counsel is "so fundamental and essential to a fair trial, and so, to due process of law, that it is made obligatory upon the states by the Fourteenth Amendment." Gideon v. Wainwright, 372 U.S. 335, 340 (1963) (quotation omitted). Inherent in the right to counsel is the right to effective assistance of counsel. Cuyler v. Sullivan, 446 U.S. 335, 344 (1980); McMann v. Richardson, 397 U.S. 759, 771 n.14 (1970); see also Strickland v. Washington, 466 U.S. 668, 686 (1984).

"The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." Strickland, 466 U.S. at 686; see also Combs v. Coyle, 205 F.3d 269, 277 (6th Cir. 2000). A two-prong test directs a court's evaluation of a claim of ineffectiveness:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel"

guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

Strickland, 466 U.S. at 687; see also Combs, 205 F.3d at 277.

The performance prong of the Strickland test requires a petitioner raising a claim of ineffectiveness to show that counsel's representation fell below an objective standard of reasonableness, or "outside the wide range of professionally competent assistance." Strickland, 466 U.S. at 690; see also Kimmelman v. Morrison, 477 U.S. 365, 386 (1986). "Judicial scrutiny of performance is highly deferential, and '[a] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.'" Combs, 205 F.3d at 278. Upon reviewing claims of ineffective assistance of counsel, the court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged actions 'might be considered sound trial strategy.'" Strickland, 466 U.S. at 689. Additionally, courts should defer to trial strategy or tactical choices if they are informed ones based upon adequate preparation. Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982). Finally, it is acknowledged that criminal defendants are "not entitled to perfect representation, only constitutionally adequate representation." Denton v. State, 945 S.W.2d 793, 796 (Tenn. Crim. App. 1996). In other words, "in considering claims of ineffective assistance of counsel, 'we address not what is prudent or appropriate, but only what is constitutionally compelled.'" Burger v. Kemp, 483 U.S. 776, 794 (1987). Notwithstanding, it is the duty of this Court to "search for constitutional [deficiencies] with painstaking care" as this responsibility is "never more exacting than it is in a capital case." Id., 483 U.S. at 785.

If the Petitioner shows that counsel's representation fell below a reasonable standard, then the Petitioner must satisfy the prejudice prong of the Strickland test by demonstrating "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. In evaluating whether a petitioner satisfies the prejudice prong, a court must ask "whether counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair." Lockhart v. Fretwell, 506 U.S. 364, 372 (1993) (citing Strickland, 466 U.S. at 687). That is, a petitioner must establish that the deficiency of counsel was of

such a degree that it deprived the defendant of a fair trial and called into question the reliability of the outcome. For example, the evidence stemming from the failure to prepare a sound defense or to present witnesses must be significant, but it does not necessarily follow that the trial would have otherwise resulted in an acquittal. Nealy v. Cabana, 764 F.2d 1173, 1178-79 (5th Cir. 1985); Code v. Montgomery, 799 F.2d 1481, 1483 (11th Cir. 1986). "A reasonable probability of being found guilty of a lesser charge, or a shorter sentence satisfies the second prong of Strickland." State v. Zimmerman, 823 S.W.2d 220, 225 (Tenn. Crim. App. 1991); see also Chambers v. Armontrout, 907 F.2d 825, 832 (8th Cir. 1990). Moreover, when challenging the imposition of a sentence of death, the petitioner must show that "there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." Henley, 960 S.W.2d at 579-80 (citing Strickland, 466 U.S. at 695).

## A. Guilt Phase Deficiencies

The Petitioner contends that trial counsel failed to function as effective counsel as guaranteed by both the Tennessee and United States Constitutions. The Petitioner asserts that trial counsel denied him effective assistance of counsel at the guilt phase of his capital trial by breaching acceptable standards for capital representation, in that:

> 1. Trial counsel was ineffective for agreeing to a consent order regarding discovery materials.
> 2. Trial counsel failed to confront Debra Kimble with her prior statement.
> 3. Trial counsel failed to prepare for trial and present evidence favorable to the Petitioner.

## 1. Consent Order

On July 4, 1999, a consent order was entered regarding discovery materials. The consent order provided in part:

> 1. Defense counsel has been advised by the State that there were no tests done on the skidmarks that were photographed at the crime scene, including but not limited to tests in which comparisons would have been made to tires on any cars. The State has also advised defense counsel that neither Timothy McKinney's car nor Debra Kimball's car were tested in any fashion and therefore, there are no reports with respect to the

-35-

existence of blood, gunshot residue, skidmark comparisons, bullet holes, fingerprints, weapons, etc. . . . on either car.

2. Defense counsel has also been advised by the State that the location of shots that were fired on the night in question by Officer Lee and/or the shooter were indeterminable.

3. Defense counsel has also been advised by the State that a search for the weapon was done on the night of the incident and that they were unable to find anything. Defense counsel has also been advised that no crime scene re-enactments were performed.

4. Defense counsel has also been advised that the State does not have Officer Williams' shirt in their possession. The State also advised defense counsel on December 18, 1998, of the existence of two blue shirts that purportedly belong to Timothy McKinney; these shirts have not been tested and there has been no indication from the State that they will be tested or used in its case-in-chief.

5. During the December 18th, 1998, court report date, the issue regarding the statements of Joyce Jeltz, Mark Lester and Charles Goin and the photographic lineups [were] discussed. The State does not have to provide defense counsel with the statements of the above witnesses since the State indicates that no exculpatory material is in the statements and they have produced the name of M.A. Embry #2426 as the officer who conducted the photo spreads.

6. Defense counsel has also been advised that the State cannot facilitate the receipt of copies of the police reports, call sheets and log reports regarding the activities of the officers on the night of the murder.

First, the Petitioner argues that the consent order constitutes per se ineffective assistance of counsel. He states that the consent order demonstrates a complete breakdown in the adversarial process. The Petitioner asserts that "Mr. Ball signed away his duty to pursue exculpatory information and received nothing in return from the prosecution." Second, the Petitioner argues that there is no legitimate strategic explanation for failing to pursue the potentially exculpatory information contained in the documents itemized in the

consent order. The Petitioner claims that Mr. Ball's basis for agreeing to the consent order can only be found in his "friendship" with the Assistant District Attorney as reported by the investigators of Inquisitor, Inc.

In United States v. Cronic, 466 U.S. 648 (1984), the Supreme Court held that an appeals court must reverse a criminal defendant's conviction "without any showing of prejudice when counsel was either totally absent, or prevented from assisting the accused during a critical stage of the proceeding." Cronic, 466 U.S. at 659 n.25. In other words, when counsel is totally absent during a critical stage of the proceedings, prejudice must be presumed. In Williams v. Taylor, the Supreme Court confirmed the vitality of this "per se" approach, noting that while the Strickland v. Washington test for ineffective assistance of counsel, requiring proof of deficient performance and prejudice provides guidance for resolving virtually all ineffective assistance of counsel claims, there are "a few situations in which prejudice may be presumed." Williams, 529 U.S. 362, 391 (2000).

From the record before this Court, we are unwilling to perceive Mr. Ball's agreement to the consent order as per se deficient performance. Mr. Ball did not testify at the post-conviction proceeding due to illness. No proof has been offered, other than speculation of the investigators, as to the basis of Mr. Ball's decision. Absent such proof, this Court will not conclude that counsel blindly refused to engage in the adversarial process. Notwithstanding, this Court elects to address the Petitioner's concerns under the Strickland standard relative to the claim that trial counsel failed to prepare for trial.

## 2. Trial Preparation

The Petitioner contends that trial counsel failed to investigate the issue of motive and the statements of eyewitnesses contrary to those witnesses presented by the State. The Petitioner also asserts that trial counsel failed to obtain an eyewitness expert, a gunshot residue expert, and forensic testing of the Petitioner's car and tire marks in the alley. We also address the Petitioner's claims that counsel relinquished the right to seek through the discovery process the dispatch log reports, police reports, and the statements of eyewitnesses.

### a. Not Deficient Performance

### i. Eyewitness Expert

The Petitioner contends that trial counsel was ineffective for failing to make an adequate offer of proof for an eyewitness expert. At the time of the Petitioner's trial, this type of evidence was per se inadmissible. See State v. Coley, 32 S.W.3d 831 (Tenn. 2000), overruled by State v. Copeland, 226 S.W.3d 287 (Tenn. 2007). Despite this per se exclusion,

trial counsel did file a motion in limine seeking admission of the expert testimony and attached articles concerning the use of such testimony.

The Petitioner failed to present any proof at the post-conviction evidentiary hearing regarding expert testimony and how an offer of proof would have benefitted the Petitioner. Because the Petitioner failed to present any proof in support of his claim, this issue is without merit.

## ii. Forensic Evidence

The Petitioner contends that trial counsel should have required their expert, Robert Cooper, to perform independent tests of the Petitioner's clothing. The record reflects that Mr. Ball provided Robert Cooper a copy of the prosecution's serology report, which showed combinations of particles found in gunpowder but did not reveal gunpowder residue. Similarly, the Petitioner further asserts that trial counsel was ineffective for failing to challenge the admissibility of the gunpowder evidence. He contends that any expert testimony regarding the Petitioner's vest was irrelevant as no witness had ever stated that the shooter wore a vest. Finally, the Petitioner contends that trial counsel erred by failing to challenge adequately the chain of custody of the vest. He cites the fact that there was no testimony at trial regarding the treatment of the Petitioner's gold vest after it was taken from his house and brought to the police property room. He contends that proof at the post-conviction hearing affirmed his allegation that the vest was mishandled in the chain of custody.

The proof at the post-conviction hearing showed that Robert Cooper agreed with the conclusions of the TBI testing of the Petitioner's clothing. Mr. Gosnell testified that Mr. Cooper was provided the findings of the State's expert and that Mr. Cooper did not dispute the State's findings. Mr. Gosnell testified that no independent testing was done on the evidence. He explained that the State's proof was not without the possibility of error and this fact was brought out at trial. The Petitioner failed to present any additional proof at the post-conviction evidentiary hearing to establish how an independent test could have benefitted the Petitioner. Regarding the Petitioner's claim to the chain of custody, he presented testimony that the vest was taken out of the bag and photographed while in police custody. There was no proof that it was exposed to gunshot residue. The Petitioner's allegations that the vest was contaminated are based on pure conjecture. The Petitioner is not entitled to relief on this claim.

### iii. Failure to Preserve Physical Evidence

The Petitioner contends that trial counsel failed to preserve physical evidence, i.e., the Petitioner's car for forensic testing, that could have impeached the testimony of Officer Lee. The Petitioner's car was seized by the Memphis Police Department on December 27, 1997, and was sold at auction on March 3, 1998. The Petitioner complains that between Mr. Ball's appointment on February 13, 1998, and March 3, 1998, Mr. Ball did nothing to secure the car. The Petitioner contends that the failure to preserve the vehicle was prejudicial because the car could have provided exculpatory evidence. The Petitioner speculates that forensic tests showing that no blood or gunshot residue were present in the car would have exonerated him, as would testing showing that the Petitioner's tires did not match the tire marks in the alley.

It is not disputed that the State did not conduct any forensic testing on the Petitioner's vehicle. While the Petitioner maintains that forensic testing of the vehicle may have provided exculpatory evidence, such statement is based purely on speculation and is not conclusive. Moreover, the Petitioner has failed to establish how results of such testing would have actually been exculpatory. The Petitioner has failed to establish that he was prejudiced by counsel's failure to preserve the Petitioner's vehicle for forensic testing. He is not entitled to relief on this claim.

### b. Deficient Performance

### i. Allegations

### (a) Motive

The Petitioner contends that counsel's failure to investigate thoroughly the issue of motive rendered counsel unprepared to present evidence undermining the prosecution's case. He asserts that the State argued that the Petitioner alone had motive to commit the shooting because his was the only altercation with Officer Williams at the club earlier that night.

At the post-conviction evidentiary hearing, the Petitioner presented evidence that other patrons had been ejected from Crumpy's Comedy Club during the party. Donald Crump testified that he had ejected a patron, who thereafter had an altercation with Officer Williams. Mr. Crump described this man as 5'10" and wearing a sports coat. Cassandra Turner testified that she observed Officer Williams escorting a patron out of the club before the comedian performed. Kevin Robinson also observed Officer Williams eject a man known as Richard "Goldie" Franklin. Finally, Febbre Berry observed a man in a blue jean jacket struggle with two security guards some time before midnight. The Petitioner asserts that had this testimony

been presented during the trial, Officer Lee's recollection that neither he nor Officer Williams had other altercations that evening would have been impeached. Additionally, he argues that the testimony of these witnesses would have undermined the State's theory of motive because it would have shown the possibility of another person having reason to seek revenge against Officer Williams for being ejected from the club.

### (b) Eyewitness Testimony

The Petitioner contends that trial counsel was ineffective for failing to discover and present the testimony of Jason Shorter and Karen Thornton. In a statement dated December 26, 1997, Karen Thornton provided the following description of the shooter: a black male, aged 29-32, 5'9", 165-170 pounds, slim built, "skinny face," and dark complected. Karen Thornton further described the shooter as wearing a black turtleneck sweater, dark pants or jeans, a black skull cap, and a long coat. Jason Shorter recalled that the shooter wore a long black shirt, black pants, and black shoes. The Petitioner asserts that both of these descriptions contradict the description provided by Officer Lee, who told the jury that the suspect wore a multi-colored sweater and gold bandana. The Petitioner asserts that had these witnesses been presented during trial, the jury would have questioned the accuracy of Officer Lee's recollection. He asserts that the absence of these statements renders the jury's verdict unreliable.

### (c) Dispatch Logs

The Petitioner concedes that the dispatch log reports may not have been subject to Rule 16 discovery because they were created in the regular course of police business before the State's investigation of Officer Williams' murder. The Petitioner asserts, however, that counsel had a duty to pursue the dispatch log reports as part of a "thorough and independent investigation." The Petitioner argues that had the dispatch logs been discovered by counsel, the defense would have had access to Officer Lee's initial description of the shooter as wearing a black shirt and white cap. This description contrasted to Officer Lee's trial testimony in which he stated that the Petitioner did not wear a hat and wore a multi-colored sweater. The Petitioner asserts that had the jury been privy to Officer Lee's inconsistent descriptions of the shooter, a reasonable probability exists that at least one juror would have concluded that Officer Lee's testimony was unreliable.

Additionally, the Petitioner asserts that the dispatch logs provided a reliable timeline of the night's events. At trial, Officer Marshall testified that he encountered the Petitioner at 12:30 a.m. The Petitioner asserts that the dispatch logs show that Officer Marshall's encounter occurred no earlier than 2:01 a.m. According to the logs, the last of the police officers who responded to Officer Williams' 1:18 a.m. radio dispatch left the club at 2:01

a.m. Officer Lee testified that the Petitioner returned to the club after the last officer left the parking lot and that Officer Marshall arrived after the Petitioner was denied entry to the club. The Petitioner asserts that he was prejudiced by the implication that the Petitioner had two hours to encounter Officer Marshall, leave the club, drive to Ms. Kimble's house, argue with Ms. Kimble, drive back to the club, park, and shoot Officer Williams. The Petitioner asserts that he could have only spent a quarter of this time on these events, rendering it virtually impossible for him to have been the shooter.

Finally, the Petitioner contends that the dispatch logs show that Officer Lee's dispatch announcing Officer Williams was down was made at 2:32:09 a.m. At trial, the State's proof was that the shooting occurred at 2:35 a.m. The Petitioner asserts that this difference in time further supports his proposition that it was unlikely that he could have been detained by Officer Williams, made two trips of four miles, argued with his girlfriend, parked his car, and shot Officer Williams in less than thirty minutes. Essentially, the Petitioner argues that the dispatch logs would have clarified the time line of the night's events by showing that Officer Marshall could not have been at the club before 2:01 a.m., the time the last officer left the club after being dispatched for a disturbance.

### (d) Eyewitness Statements

The Petitioner complains that Mr. Ball acquiesced in the non-disclosure of exculpatory statements by Mark Lester, Charles Goin, and Joyce Jeltz. The Petitioner asserts that these descriptions contradict the description provided by Officer Lee, who told the jury that the suspect wore a multi-colored sweater and gold bandana. The Petitioner asserts that had these witnesses been presented during trial, the jury would have questioned the accuracy of Officer Lee's recollection. He asserts that the absence of these statements renders the jury's verdict unreliable. We summarize the substance of the in-house statements obtained from these witnesses as follows:

> **Mark Lester** saw the shooting and later provided a considerably different description of the event than that given by the State's witnesses. Mr. Lester stated that he heard two gunshots. He saw a man fall down and heard the shooter state "Pay back is a mother f\*\*cker." Mr. Lester observed the shooter run into the parking lot and get into the back seat of a blue four-door Oldsmobile being driven by a black male wearing a dark colored cap. Mr. Lester further described the shooter as a black male, 6'2", 190 pounds, and short black hair. He added that the shooter was wearing blue jeans and a blue shirt with darker blue around the shoulders. Mark Lester also did not see Office Lee

-41-

anywhere in the vicinity at the time of the shooting. Mark Lester could not identify the shooter from the photospread containing a picture of the Petitioner.

**Charles Goin** viewed a photo spread but could not identify the Petitioner as the shooter.

**Joyce Jeltz** saw the shooting from the vantage point of being five feet away from the victim. In a statement given December 26, 1997, Joyce Jeltz described the perpetrator as wearing brown pants and a dark colored knit turtleneck sweater which was pulled over his nose and mouth. She stated that the shooter had his left hand over his face. Ms. Jeltz added that only one shot was fired and then the suspect ran. She then heard two or three more gunshots. She added that her car received damage from the gunshots. She described the shooter as a black male, 5'10", 25 to 30 years old, 160 to 180 pounds, dark complected, low fade hair cut, and dark brown hair. Ms. Jeltz was unable to identify the shooter from a photospread. On August 19, 1998, Ms. Jeltz talked with Alyson Frazier. During this interview, she told Ms. Frazier that she arrived at the club between 11:00 p.m. and 11:30 p.m. She stated that she only stayed at the club for thirty to forty-five minutes. She provided a similar description of the shooter as provided in her December 26 statement but added that the shooter was not wearing a vest or a jacket. At trial, Jeltz testified that the shooter was wearing a gold vest. Ms. Jeltz admitted that she saw the Petitioner on television. Ms. Jeltz also indicated that Officer Lee was standing facing Officer Williams at the time of the shooting.

### (e) Police Reports

The Petitioner contends that by virtue of the Consent Order, trial counsel relinquished access to police reports, including one report including a statement given by Officer Lee to the Inspectional Services Bureau just a few hours after the shooting, unequivocally stating that the Petitioner was not wearing a multi-colored sweater. In the report, Officer Lee had described the perpetrator as a black male, 5'11", 180 pounds, and wearing a white cap. Officer Lee also commented that the perpetrator had removed the multi-colored sweater and was wearing a black t-shirt and pants. He added that the perpetrator was still wearing the

orange shoes. The report further reflected that dispatch indicated a call time of 2:39 a.m. and that Officer Lee requested the ambulance to expedite at 2:41 a.m.

### (f)  Debra Kimble's Statement

The Petitioner contends that counsel's failure to confront Debra Kimble with her prior statement to investigators constitutes deficient performance. Months before her testimony, Debra Kimble told defense investigators that she and the Petitioner had argued for twenty minutes after he arrived at her apartment at 2:15 a.m. or later. The Petitioner states that had Ms. Kimble and the Petitioner argued for twenty minutes, the Petitioner could not have shot Officer Williams. The Petitioner asserts that Ms. Kimble's statement establishes his alibi.

At trial, Debra Kimble testified that the Petitioner arrived at her apartment at approximately 2:15 a.m. She testified that she and the Petitioner talked for a "couple of minutes, maybe." She stated that she then returned to her bedroom alone and went back to sleep. When she awoke the next morning, the Petitioner was gone. On cross-examination, defense counsel questioned Debra Kimble as to what time the Petitioner arrived and how long he stayed at her apartment. Ms. Kimble confirmed that the Petitioner arrived between 2:15 and 2:20 a.m. and that they only talked for a couple of minutes. Ms. Kimble confirmed that she returned to her bedroom and that she permitted the Petitioner to sleep on her couch. She testified that the Petitioner left a multi-colored sweater, a gold vest, and a hat at her residence. The Petitioner asserts that had counsel confronted Ms. Kimble with her prior statement, the jury would have had the basis upon which to question the strength of her recollection.

During the post-conviction hearing, Mr. Gosnell testified that the defense team spoke with Debra Kimble. He characterized her statements as being of "extremely limited value" because she could not corroborate the Petitioner's alibi. He related that there was no evidence that could place the Petitioner at Debra Kimble's apartment between 2:30 a.m. and 2:33 a.m. when the shooting occurred. Ms. Kimble told the defense team that she saw the Petitioner around 2:15 a.m. She stated that she then went back to sleep. The distance between Ms. Kimble's apartment and the club was about four and one-half minutes by car.

### ii.  Testimony During Trial

The State's proof at trial primarily relied upon Officer Lee's identification of the Petitioner. Officer Lee testified that he had an encounter with the Petitioner earlier on the evening of the crime. He explained that the Petitioner was "screaming that his car had been stolen." Officer Lee stated that during this encounter, the Petitioner "had on a black derby, a multi-colored sweater," dark pants, "some goldish-yellow hush puppies with a buckle

-43-

across them and a gold vest." Officer Lee testified that as a result of this encounter, the Petitioner was told that he was not permitted back into the club. Regarding the shooting, Officer Lee testified that "around 2:30 or 3:00," he and Officer Williams went outside. He said that Officer Williams was standing right beside him, "our elbows was touching." Officer Lee "heard a shot." He testified that he turned around and saw Officer Williams down. He started chasing after the shooter. He then exchanged gunfire with the shooter. Officer Lee testified that the shooter got into his car and left going towards James Road. Officer Lee testified that he recognized the shooter as the Petitioner "[o]nce he opened the door, the dome light came on and after he shot Officer Williams, we looked eye to eye. He looked at me and I looked at him." Officer Lee testified that at the time of the shooting, the Petitioner was not wearing a vest or a hat. Officer Lee testified that the Petitioner was wearing the yellow shoes, the multi-colored sweater, dark pants, and he had a bandana across his face. Officer Lee's identification focused on the Petitioner's eyes which he described as "dark and glazed." Officer Lee affirmed that the Petitioner had "the same sweater on" that he had been wearing during the earlier encounter with Officers Lee and Williams.

On cross-examination, trial counsel questioned Officer Lee as to the perpetrator's clothing at the time of the shooting. Officer Lee confirmed that the Petitioner was wearing a sweater, the goldish shoes, and dark trousers. Officer Lee added that the Petitioner was also wearing a gold bandana across his nose and mouth.

At trial, Joyce Jeltz testified that the shooter was approximately 5'10", thin build, between 160 and 180 pounds, thin shape, and a longer, slim face. Ms. Jeltz added that the shooter was wearing dark colors, brown pants and a brown vest. She stated that the shooter had a "sweater pulled up around his face." On cross-examination, trial counsel questioned Ms. Jeltz as to her description of the shooter's clothing. Ms. Jeltz affirmed that the shooter was wearing dark clothing and had the lower portion of his face covered with clothing. Ms. Jeltz testified that the shooter was not wearing a hat. Trial counsel questioned Ms. Jeltz regarding her December 26th statement in which she did not mention the fact that the shooter was wearing a vest. She responded, "I remember now, better than I did, exactly at that time. Because I can see it over and over." She explained that she remembered the vest after giving her initial statement.

During closing argument, the prosecution relied upon Officer Lee's identification of the Petitioner. The State argued that "[Officer Lee]'s a trained observer." The closing argument bolstered the significance of Officer Lee's identification. The prosecutor referenced the fact in closing that Officer Lee "saw the sweater, he saw the face and he saw the car." The prosecutor also made the following statements: "He made an identification." "He made an identification not only of a person, but of clothing." In rebuttal, Mr. Ball argued that the "question of identity is an essential issue in this case." Mr. Ball

-44-

acknowledged the contradiction between Lee's testimony at trial and his December 26th statement stating that he first identified the Petitioner "when the dome light in the car came on." He also commented on Joyce Jeltz's contradictory statements regarding whether or not the shooter was wearing a vest.

### iii.  Analysis

Counsel's duty to investigate and prepare derives from counsel's basic function"to make the adversarial testing process work in the particular case." Kimmelman v. Morrison, 477 U.S. 365, 384 (1986).  Counsel's duty to investigate all reasonable lines of defense is most strictly observed in capital cases.  Although trial counsel is afforded great deference over matters of trial strategy, the decision to select a trial strategy must be reasonably supported and within the wide range of professionally competent assistance. Strickland, 466 U.S. at 690.  Viewing the performance of counsel solely from the perspective of strategic competence, the reviewing court must find that defense counsel made a significant effort, based on reasonable investigation and logical argument, to present the defendant's case ably to the jury.  An attorney is not ineffective merely because he fails to follow every evidentiary lead.  However, a strategic decision is not reasonable when the attorney has failed to investigate his options and make a reasonable choice between them.

The evidence presented at the post-conviction evidentiary hearing revealed that counsel knew of or should have known of contradicting identifications by witnesses, including the prosecution's key witnesses: Joyce Jeltz and Officer Lee.  The Petitioner provided numerous exhibits illustrating that the investigators informed trial counsel of numerous conflicting statements of witnesses.  The testimony at the Petitioner's original trial evidences that trial counsel essentially ignored the conflicting statements by failing to cross-examine Officer Lee and Joyce Jeltz thoroughly and by failing to present the testimony of additional witnesses who were present at the time of the shooting.  Trial counsel had within their control admissible evidence which would have permitted the defense to emphasize flaws in the prosecution's case.  By failing to cross-examine Officer Lee effectively as to his conflicting statements regarding the identification he provided of the shooter, trial counsel left the jury with essentially unrebutted and untested testimony.  Trial counsel's failure to use the prior statements of Officer Lee as well as his failure to use the conflicting identifications of other witnesses failed to subject the prosecution's case adequately to the adversarial process.

The evidence convicting the Petitioner was not overwhelming.  Again, the State's case relied upon the eyewitness identification of the Petitioner by Officer Lee.  In closing argument, the prosecution referred to Officer Lee as a "trained observer."  The strategy of the defense was to question the prosecution's evidence regarding the perpetrator's identity.

Trial counsel failed to use information readily available to attack the prosecution's eyewitness testimony. Indeed, counsel failed to use Officer Lee's own contradictory statements of identification to counter his trial testimony. At trial, Officer Lee unequivocally maintained that the shooter was wearing a multi-colored sweater. Trial counsel failed to use Officer Lee's own prior statements that the shooter was wearing a black shirt and a white cap. Similarly, counsel failed to take advantage of the statements of Mark Lester, Charles Goin, and Joyce Jeltz obtained by Inquisitor, Inc., as referenced in their numerous in-house memoranda. Likewise, by agreeing to the consent order, counsel relinquished the opportunity to gain information which would have contradicted Officer Lee's in-court testimony. With regard to a motive for the shooting, the State focused upon the fact that the Petitioner had a previous altercation with Officer Williams that evening. Trial counsel failed to attack this aspect of the prosecution's case by ignoring evidence of incidents that evening involving other patrons. Finally, counsel's cross-examination of Debra Kimble failed to call into question her previous account that the discussion between herself and the Petitioner lasted twenty minutes and not the "couple" minutes as she testified. Thus, not only did counsel fail to assist their client by not using information available through their own investigators, counsel negatively impacted the defense by agreeing to the consent order which resulted in the failure to obtain useful information to the defense.

When an attorney has made a series of errors that prevents the proper presentation of a defense, it is appropriate to consider the cumulative impact of the errors in assessing prejudice. See Harris by and through Ramseyer v. Wood, 64 F.3d 1432, 1438 (9th Cir. 1995) (citations omitted). While it remains the burden of the Petitioner to " prove prejudice," see Strickland, 466 U.S. at 693, the Petitioner is not required to demonstrate how the result would have been different. Rather, a defendant must show that there is a reasonable probability that absent the deficiencies of counsel the outcome of the trial would have been different. A reasonable probability does not mean a certainty, or even a more likely than not different outcome. Strickland, 466 U.S. at 694. It does not mean that no rational juror could constitutionally find the Petitioner guilty. The reviewing court does not ask as to whether the defendant is innocent of the crime. The question remains whether the defendant was deprived of a reasonable chance of acquittal due to his counsel's performance.

The inconsistent testimony and statements of Officer Lee and Joyce Jeltz could easily have raised questions in the minds of the jurors regarding their credibility and their ability to identify the Petitioner as the shooter. Questions of credibility of witnesses are not aptly reviewed in hindsight by an appellate court. Conflicting statements may appear insignificant upon a cold record after the fact. The same statements, however, may very well prove significant when observed first hand by a jury. As such, it is the jury, not the appellate court, whose province it is to evaluate the witnesses credibility and to decide the defendant's guilt. See Matthews v. Abramajtys, 319 F.3d 780, 790 (6th Cir. 2003). The actual resolution of the

conflicting evidence, the credibility of witnesses, and the plausibility of competing explanations is the task to be performed by a rational jury. Counsel in the present case failed to present such a case to the jury with their failure to cross-examine competently the witnesses identifying the Petitioner as the shooter. The jury in the present case was deprived of the right to hear testimony that could have supplied a "reasonable doubt." Counsel's failure to present readily available evidence challenging the eyewitness identification sufficiently undermines confidence in the outcome of this case to establish prejudice. See, e.g., Avery v. Prelensnik, 548 F.3d 434, 439 (6th Cir. 2008) (counsel's failure to investigate testimony of potential alibi witnesses prejudiced defendant's trial); Higgins v. Renico, 470 F.3d 624, 635 (6th Cir. 2006) (counsel's failure to cross-examine key identification witness undermined confidence in outcome of case). Counsel's failure to conduct an adequate pretrial investigation, counsel's failure to prepare for trial adequately, and counsel's failure to use the information available at the time of trial suffices for a showing of prejudice. Counsel's deficient actions throughout their representation of the Petitioner collectively establish a prejudice of such magnitude that we can reach no conclusion other than that the errors cumulatively prejudiced the Petitioner's right to a fair proceeding and undermined confidence in the outcome of the trial. We conclude that a reasonable probability exists that absent the deficiencies of counsel, the outcome of the trial would have been different.

### B. Penalty Phase Deficiencies

To prevail on a claim that counsel were ineffective in the penalty phase of a capital trial, the petitioner must show "a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." Strickland, 466 U.S. at 695. The Petitioner raises two complaints that trial counsel failed to function as effective counsel as guaranteed by both the Tennessee and United States Constitutions. In this regard, the Petitioner asserts that trial counsel denied him effective assistance of counsel at the penalty phase of his capital trial by breaching acceptable standards for capital representation, in that:

> 1. Trial counsel was ineffective for failing to investigate mitigating circumstances adequately; and
> 2. Trial counsel failed to introduce evidence of the residual doubt of the Petitioner.

### 1. Failure to Investigate Mitigating Circumstances

The Petitioner contends that trial counsel failed to investigate mitigating circumstances adequately. Specifically, the Petitioner complains (1) that counsel did not provide sufficient funds for Inquisitor, Inc. to complete the investigation of mitigation

evidence and (2) that counsel did not consult with Inquisitor, Inc.'s investigator as to the information she developed. The Petitioner maintains that trial counsel refused to communicate with Glori Shettles, the Inquisitor investigator, leaving her to complete her investigation on her own. The Petitioner blames Ms. Shettles' failure to obtain relevant documents, including the Petitioner's birth, medical, and juvenile correction records, on trial counsel's lack of instruction and funding. Along similar lines, the Petitioner submits that because the Petitioner's background investigation was incomplete, Dr. Ciocca's evaluation of the Petitioner was based on incomplete information and he was unable to render a complete and accurate evaluation of the Petitioner. The Petitioner argues that Dr. Ciocca was unaware that the Petitioner's mother suffered from a uterine infection at the time of the Petitioner's birth resulting in the Petitioner's lack of oxygen and likely resulting brain damage. Additionally, Dr. Ciocca was unaware of the Petitioner's drug and alcohol addiction. Finally, the Petitioner complains that the jury never heard testimony about the Petitioner's brain defects, that the Petitioner's mother was "mentally slow" and emotionally disturbed, and that three of the Petitioner's half-siblings were mentally retarded.

In the context of capital cases, a defendant's background, character and mental condition are unquestionably significant. "[E]vidence about the defendant's background and character is relevant because of the belief . . . that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional and mental problems, may be less culpable than defendants who have no such excuse." California v. Brown, 479 U.S. 538, 545 (1987); see Eddings v. Oklahoma, 455 U.S. 104, 113-115 (1982); Lockett v. Ohio, 438 U.S. 586, 604-605 (1978) (plurality opinion); Zagorski v. State, 983 S.W.2d 654, 657-658 (Tenn. 1998). The right that capital defendants have to present a vast array of personal information in mitigation at the penalty phase, however, is constitutionally distinct from the question whether counsel's choice of what information to present to the jury was professionally reasonable.

There is no constitutional imperative that counsel must offer mitigation evidence at the penalty phase of a capital trial. Nonetheless, the basic concerns of counsel during a capital sentencing proceeding are to neutralize the aggravating circumstances advanced by the state and to present mitigating evidence on behalf of the defendant. Although there is no requirement that defense counsel present mitigating evidence, counsel does have the duty to investigate and prepare for both the guilt and the penalty phases. See Goad v. State, 938 S.W.2d 363, 369-370 (Tenn. 1996).

Although no absolute duty requires investigating particular facts or a certain line of defense, counsel does have a duty to make reasonable investigation or to make a reasonable decision that makes particular investigation unnecessary. Strickland, 466 U.S. at 691. In determining whether counsel breached this duty, counsel's performance is reviewed for

-48-

reasonableness under prevailing professional norms, which includes consideration of the challenged conduct as seen from counsel's prospective at the time of the representation. Wiggins v. Smith, 539 U.S. 510, 523 (2003) (citations omitted). Counsel is not required to investigate every conceivable line of mitigating evidence no matter how unlikely the effort would assist the defendant at sentencing. Id. at 533. Neither is counsel required to interview every conceivable witness. Hendricks v. Calderon, 70 F.3d 1032, 1040 (9th Cir. 1995). In other words, counsel's duty to investigate and prepare is not limitless. See Washington v. Watkins, 655 F.2d 1346 (5th Cir. 1981). Counsel's performance will not be found deficient for failing to unveil all mitigating evidence, if, after a reasonable investigation, nothing has put counsel on notice of the existence of that evidence. See Babbit v. Calderson, 151 F.3d 1170, 1174 (9th Cir. 1998) (citation omitted). In summary, "no particular set of detailed rules can satisfactorily take account of the variety of circumstances faced by defense counsel. Rather, courts must judge the reasonableness of counsel's conduct on the facts of the particular case, viewed as of the time of counsel's conduct, and judicial scrutiny of counsel's performance must be highly deferential." Roe v. Flores-Ortega, 528 U.S. 470, 477 (2000) (internal citations and quotations omitted).

To determine whether or not trial counsel was ineffective for failing to present mitigating evidence, the reviewing court must consider several factors.

> 1. The reviewing court must analyze the nature and extent of the mitigating evidence that was available but was not presented. Goad, 938 S.W.2d at 371 (citing Deutscher v. Whitley, 946 F.2d 1443 (9th Cir. 1991); Stephens v. Kemp, 846 F.2d 642 (11th Cir. 1988); Cooper v. State, 847 S.W.2d 521, 532 (Tenn. Crim. App. 1992); State v. Adkins, 911 S.W.2d 334 (Tenn. Crim. App. 1994)).
>
> 2. The court must determine whether substantially similar mitigating evidence was presented to the jury in either the guilt or penalty phase of the proceedings. Goad, 938 S.W.2d at 371 (citing Atkins v. Singletary, 965 F.2d 952 (11th Cir. 1992); Clozza v. Murray, 913 F.2d 1092 (4th Cir. 1990); Melson, 722 S.W.2d at 421).
>
> 3. The court must consider whether there was such strong evidence of applicable aggravating factor(s) that the mitigating evidence would not have affected the jury's determination. Goad, 938 S.W.2d at 371 (citing Fitzgerald v. Thompson, 943

F.2d 463, 470 (4th Cir. 1991); <u>Elledge v. Dugger</u>, 823 F.2d 1439 (11th Cir. 1987).

The trial court entered the following findings of fact and conclusions of law:

> Next, petitioner contends counsel failed to investigate and present critical mitigation regarding his neuropsychological functioning. Petitioner acknowledges that counsel called Dr. Ciocca to testify about his mental health and abilities, but argues that [Dr.] Ciocca was not properly prepared and did not present an adequate picture of petitioner's abilities or his habitual substance abuse. [Dr.] Ciocca testified that he reviewed petitioner's school records and found petitioner had a low learning ability in a variety of subjects; had a "low average" IQ; and, at the age of nine, was placed in special education courses. [Dr.] Ciocca also testified that petitioner had indicated to him that he used marijuana and drank alcohol and admitted to drinking on the night in question. At the post-conviction hearing, petitioner presented testimony from Dr. Auble, also a neuropsychologist. While it is clear Dr. Auble reviewed additional documents not reviewed by Dr. Ciocca, administered numerous tests and spent a good deal longer evaluating petitioner, this court finds that her conclusions as to the state of petitioner's mental abilities and substance abuse were essentially the same. Although she was able to testify about petitioner's troubled birth and the [effect] it may have had on petitioner's neurological functioning, her testimony did little more than provide a possible explanation for petitioner's low academic achievement.
>
> . . .[P]etitioner also presented testimony from Dr. Smith, an expert on addiction. Dr. Smith gave extensive testimony regarding petitioner's habitual substance abuse. This court agrees that Dr. Smith's testimony was far more extensive than that provided by Dr. Ciocca at trial. However, this court finds that counsel was not ineffective in failing to present this proof. At the post-conviction hearing, both trial counsel and the defense retained mitigation investigator testified petitioner never indicated to them that he had a substance abuse problem or told them about the extent of his drug and alcohol use. Petitioner

testified at the sentencing phase and could have informed the jury of his substance abuse, but did not do so. Additionally, petitioner's sister testified that she knew petitioner smoked marijuana and drank alcohol from time to time, but testified that he did not use these substances "heavily" and further indicated that she was never concerned about petitioner['s] drug use or alcohol consumption. While Glori Shettles, the mitigation investigator testified that petitioner's juvenile records did include several drug offenses; but, she testified she did not investigate further or indicate to counsel that this was an issue for mitigation. Given the testimony at the post-conviction hearing and the testimony that was presented through Dr. Ciocca at trial, this court finds counsel was not ineffective in failing to present additional proof about petitioner's substance abuse. Thus, this court finds petitioner's allegation that counsel failed to properly present testimony about his mental deficits and substance abuse is without merit.

Finally, petitioner contends counsel completely failed both to request sufficient funds for an adequate investigation of his social history and failed to provide direction to the mitigation investigator. Petitioner argues that it was error for counsel to fail to present any evidence regarding his family life and family history. He asserts counsel should have presented the following testimony: his grandparents were sharecroppers who worked in the fields; that petitioner's mother and her siblings were not able to go to school on a regular basis; that his mother became pregnant at fifteen, but lost the baby and became severely depressed; his mother sought psychiatric treatment and had seizures; his maternal grandfather was an alcoholic and was abusive; his aunt described him as "quiet" and "well-mannered;" he, his parents and seven step siblings lived in a three bedroom house; his parents could not read; he was often left on his own and subjected to very little discipline as a child; he was in special education courses; he dropped out of school; and his friends described him as "quiet" and "well mannered" and knew he was determined not to go back to prison. Despite petitioner's contentions, this court finds much of this information was elicited at the sentencing phase and the failure to present the

remaining testimony does not render counsels' representation ineffective. This issue is without merit.

During the penalty phase of his trial, the Petitioner presented the testimony of numerous family members and friends who described the defendant's background and characteristics, including his mother and his stepfather, co-workers Steven and Linda Moshier, and friend Zacharias Stewart. Dr. Ciocca testified that the Petitioner had a low learning ability in reading, writing, and mathematics. He stated that the Petitioner had a "low average" IQ and had been placed in special education class when he was nine years old. Dr. Ciocca related that the Petitioner's learning disability, lethargy, and despondency at a young age revealed a need for psychological help that he never received. The Petitioner testified on his own behalf, stating that he was the father of two children, both of whom had died. He stated that he had learning problems in school. The Petitioner admitted that he had been drinking and smoking marijuana on the day of the offenses. The Petitioner denied killing Officer Williams and accused the State's witnesses of lying. The Petitioner admitted that he had served time for aggravated robbery, but he said he had only driven the getaway car. The Petitioner admitted that he had juvenile adjudications for aggravated assault, but he similarly minimized his role in these incidents.

Mr. Gosnell testified at the post-conviction hearing that Ms. Shettles never reported that she was unable to find anything to support certain issues they were interested in, such as information establishing that the Petitioner suffered from psychological problems. Dr. Ciocca testified that the Petitioner had a low learning ability for reading, writing and math, had a low average IQ, had a learning disability and suffered from lethargy, despondency, and had psychological needs that were never met. Ms. Shettles found family members to testify about the Petitioner's home life and mitigation circumstances. Mr. Gosnell did not recall having any witnesses presented to them by the Petitioner that they did not call to testify. He stated that the goal of mitigation was to paint a picture of a young man who had some problems but was liked and respected by his family members. He conceded that the Petitioner's mitigation witnesses gave broad character assessments that permitted questions about the Petitioner's juvenile records to be asked.

At the post-conviction hearing, the Petitioner presented the testimony of the following witnesses as potential mitigation witnesses, whose testimony we summarize as follows:

1. Dr. Pamela Auble. Dr. Auble evaluated the Petitioner. She related that the Petitioner's low Apgar scores at birth could put a child at risk for later difficulties. She could not state with certainty that the lack of oxygen at birth conclusively caused the Petitioner's later learning disability. Dr. Auble said the Petitioner's abuse of alcohol and marijuana began at age ten or eleven. She stated that the Petitioner had provided the staff at Northwest

Correctional Complex with inaccurate information during his prior term of incarceration. Dr. Auble diagnosed the Petitioner with attention deficit hyperactivity disorder, primarily inattentive type. She also diagnosed him with marijuana dependence and alcohol dependence. She stated that the Petitioner was a little bit paranoid. She agreed with Dr. Ciocca's opinion that the Petitioner's drug and alcohol abuse made him more impulsive.

2. Dr. Murray Smith. Dr. Smith reported that the Petitioner stated that by the age of thirteen, he was using marijuana and alcohol on a daily basis and that he was dealing marijuana on the street. The Petitioner also stated that on the date of the shooting, he had began using marijuana and alcohol at 8:00 a.m. Dr. Smith opined that the Petitioner had a chronic use of alcohol and marijuana. He added that the Petitioner was suspicious and untrusting of other people. He said the Petitioner's poor judgment and impulse reaction were evident in the Petitioner's response to the confrontation with the officers at the club. Dr. Smith added that the Petitioner's level of intoxication could have caused alcohol-induced amnesia and he could have "filled in the blanks" when he described going to his girlfriend's home. He opined that the Petitioner could have substituted his own belief of what happened that night and that it became his "reality" even if evidence contradicts that belief.

3. Everlean Fleming. Everlean Fleming, the Petitioner's aunt, testified that her father drank and verbally and physically abused their grandmother. She stated that the Petitioner's mother had a miscarriage at the age of fifteen and suffered seizures afterward. She testified that the Petitioner had a good personality as a child and liked going to school.

4. Wanda Palmer. Wanda Palmer, the Petitioner's aunt, testified that her father drank and would yell a lot. She only recalled the Petitioner's mother having a seizure once before the Petitioner was born.

5. Sharon Marion. Sharon Marion, the Petitioner's half-sister, testified that the Petitioner was a happy child. She stated that he worked upon his release from prison and swore he would never go back. Ms. Marion added that the Petitioner smoked marijuana and drank alcohol from the time that he was fourteen but that she was not concerned because he "wasn't doing it like a drug addict."

6. Jennifer Stewart. Jennifer Stewart, a childhood friend, testified that the Petitioner was a nice person who attended church. She was unaware that the Petitioner used marijuana and alcohol.

7. Carolyn Whitley. Carolyn Whitley, the Petitioner's special education teacher, testified that the Petitioner did not have any behavioral problems and she believed he was ready for the ninth grade when he left her classroom. She explained that students in her classroom

would be phased back into their regular classrooms and that she basically just tutored the students. Ms. Whitley stated that the Petitioner had a B average while in her classroom.

We conclude that testimony that the Petitioner was loved, that the Petitioner was a nice young man, and that the Petitioner had a learning disability was merely cumulative to evidence already presented in the penalty phase of the trial. While the Petitioner did present new information from family members and friends, we cannot conclude that the introduction of such information to the jury would have been significantly beneficial mitigating evidence. Additionally, these witnesses could have been asked questions as to the Petitioner's juvenile and adult convictions. The Petitioner has failed to establish that there is a reasonable probability that had this additional information been presented during the penalty phase that the jury would have concluded that the balance of the aggravating and mitigating circumstances did not warrant death.

As recognized by the post-conviction court, Drs. Smith and Auble's testimony concerning the Petitioner's substance abuse was more extensive than that of Dr. Ciocca. The Petitioner had the opportunity during the penalty phase to inform the jury of the extent of his substance abuse. He did not elaborate. However, the Petitioner's testimony during the penalty phase was consistent with the testimony of Sharon Marion, who described the Petitioner's drug use as casual, and not "like a drug addict." It is uncertain the impact of contradictory testimony regarding the level of the Petitioner's marijuana use before the jury. While such missing information may have been beneficial to Dr. Ciocca, we cannot conclude that Dr. Ciocca's diagnosis would have been altered by the information. Dr. Ciocca related that the Petitioner had a learning disability. This diagnosis is not significantly distinct from the diagnosis of Dr. Auble such that it would have had an effect upon the jury as to alter the outcome. Additionally, Dr. Smith's testimony may not have been beneficial to the Petitioner. The jury found the presence of one aggravating circumstance, that the Petitioner had a prior felony conviction for aggravated robbery with statutory elements that involved the use of violence. The prior violent felony aggravating factor "may be more qualitatively persuasive and objectively reliable" than other factors. See State v. Boyd, 959 S.W.2d 557, 561 (Tenn. 1998). With this consideration, we cannot conclude that additional information as to the Petitioner's substance abuse would have led the jury to impose a sentence other than one of death. The Petitioner is not entitled to relief on this basis.

In sum, this is not a case in which counsel failed to conduct any inquiry into the accused's background and social history. See Williams, 529 U.S. at 396. Regardless of what a different investigation might have uncovered, the Petitioner must first demonstrate that counsel's decision not to investigate further was objectively unreasonable performance. Cauthern v. State, 145 S.W.3d 571, 604 (Tenn. Crim. App.), perm. to appeal denied, (Tenn.

2004). The Petitioner has failed to establish that counsel's performance was objectively unreasonable performance. He is not entitled to relief as to this issue.

## 2. Failure to Introduce Evidence of Residual Doubt

"[R]esidual doubt evidence" may consist of proof admitted during the sentencing phase that indicates the defendant did not commit the offense, notwithstanding the jury's verdict following the guilt phase. McKinney, 74 S.W.3d at 307 (citing State v. Hartman, 42 S.W.3d 44, 55-56 (Tenn. 2001)). On direct appeal, the Petitioner argued and the State conceded that the trial court erred in refusing to allow defense counsel's argument. McKinney, 74 S.W.3d at 306-307. The supreme court acknowledged that:

> . . . the defendant's proposed argument was based on the evidence, *i.e.*, the testimony of witnesses Lee and Jeltz with regard to whether the defendant had been wearing a vest. Moreover, it was in fair response to the prosecutor's argument that the defendant's testimony that he was not the shooter had not been credible because gunshot residue had been found on the defendant's vest. The trial court therefore erred by refusing to allow the argument simply because it had the effect of alluding to residual or lingering doubt.

Id. at 308. Notwithstanding the error, the supreme court determined that because the proposed argument did not have the substance or weight of evidence and considering that this was not a resentencing hearing, the sentencing jury had already heard the testimony underlying the argument and reconciled it in favor of the State's theory of guilt and against the Petitioner's theory of innocence. Id. Thus, the supreme court concluded that the proposed argument was of "dubious value either as residual doubt or in mitigation." Id. Finally, the court noted that the aggravating circumstance was strongly supported by the evidence. Accordingly, the supreme court determined that the Petitioner had failed to establish that the trial court's error affected the jury's verdict to his prejudice and any error was harmless. Id.

In the post-conviction setting, the Petitioner again cites as error the failure to present residual doubt evidence during the penalty phase of the trial. The Petitioner now couches his claim in terms of the ineffectiveness of trial counsel. He argues that had trial counsel conducted an adequate investigation, it would have yielded additional residual doubt evidence not heard by the jury. The Petitioner classifies his "residual doubt" evidence as the numerous eyewitnesses, including Jason Shorter, who witnessed both the shooting and the shooter; the description provided by Mark Lester; the evidence of the victim's altercations

with other patrons on the night of the shooting; evidence withheld by the State; the cross-examination of his alibi witnesses; and the descriptions of the shooter provided by other patrons that did not match the Petitioner's description.

We agree. Consistent with our decision concluding that the Petitioner was prejudiced by counsel's failure to use and present information which would have attacked the credibility of the prosecution's eyewitness testimony and implicate another person at the guilt phase, we similarly conclude that a reasonable probability exists that if counsel had introduced this same evidence as "residual doubt" evidence, the outcome would have been different.

## II. PROSECUTORIAL MISCONDUCT

The Petitioner contends that the prosecution violated its obligations to seek justice. The Petitioner maintains that the Shelby County District Attorney's Office has "committed egregious acts of misconduct which denied him his constitutional right to a fair trial and rendered the outcome of the trial fundamentally unfair." Specifically, he contends that "[t]hese acts include the improper suppression of exculpatory eyewitness statements and police logs, the presentation of testimony that the state knew was false, and the mishandling of physical evidence."

### A. Brady Violations

The Petitioner claims that the State knowingly withheld exculpatory evidence and this was implicit in its agreeing to the Consent Order. The Petitioner alleges that the State concealed dispatch logs, eyewitness statements, photo spread statements, and police reports. He contends that these items indicated that witnesses existed who saw the shooting and did not identify the Petitioner as the shooter.

Every criminal defendant "has a constitutionally protected privilege to request and obtain from the prosecution evidence that is either material to guilt or relevant to punishment." State v. Ferguson, 2 S.W.3d 912, 915 (Tenn. 1999). In Brady, the United States Supreme Court held that the prosecution has a constitutional duty to furnish an accused with exculpatory evidence pertaining to either the accused's guilt or innocence or the punishment that may be imposed. Failure to reveal exculpatory evidence violates due process when the evidence is material either to guilt or punishment, irrespective of the prosecution's good faith. Brady v. Maryland, 373 U.S. 83, 87 (1963). Evidence that is "favorable to the accused" includes evidence that is deemed to be exculpatory in nature and evidence that could be used to impeach the State's witnesses. State v. Walker, 910 S.W.2d 381, 389 (Tenn. 1995); State v. Copeland, 983 S.W.2d 703, 706 (Tenn. Crim. App. 1998); see also United States v. Bagley, 473 U.S. 667, 676 (1985).

The "prosecution is not required to disclose information that the accused already possesses or is able to obtain." State v. Marshall, 845 S.W.2d 228, 233 (Tenn. Crim. App. 1992). However, "the prosecutor is responsible for 'any favorable evidence known to the others acting on the government's behalf in the case, including the police.'" Strickler v. Greene, 527 U.S. 263, 275 n.12 (1999) (citing Kyles v. Whitley, 514 U.S. 419, 437 (1995)). Nevertheless, there is "no constitutional requirement that the prosecution make a complete and detailed accounting to the defense of all police investigatory work on a case." Walker, 910 S.W.2d at 389 (quoting Moore v. Illinois, 408 U.S. 786, 795 (1972)).

The Tennessee Supreme Court has held that in order to establish a Brady violation, four elements must be shown by the defendant:

> (1) that the defendant requested the information (unless the evidence is obviously exculpatory, in which case the State is bound to release the information whether requested or not);
> (2) that the State suppressed the information;
> (3) that the information was favorable to the accused; and
> (4) that the information was material.

State v. Edgin, 902 S.W.2d 387, 390 (Tenn. 1995); see also Walker, 910 S.W.2d at 389.

The post-conviction court entered the following findings of fact and conclusions of law:

> [P]etitioner argues that had the defense adequately investigated and received key exculpatory documents from the District Attorney and the Investigative Services Division or Internal Affairs unit of the Memphis Police Department, the defense would have learned that, in fact, it was "virtually impossible" for Petitioner to be a[t] the club by 2:30 a.m. to commit the shooting. Petitioner argues that Officer Marshall's trial testimony that he arrived at the club around 12:30 a.m. was in direct conflict to two statements Marshall made earlier, which were never turned over to the defense. Petitioner claims Officer Marshall gave a statement the same day of the incident in which he said he arrived at the club between 1:00 a.m. and 1:30 a.m. and nearly two months later gave a statement to the Investigative Services Division in which he estimated his time of arrival to be approximately 12:45 a.m. Petitioner . . . asserts Marshall "perjured" himself at trial to avoid disciplinary action and

further contends the State was "complicit" in his lie because it better fit their time line.

. . .[T]his court notes that the dispatch logs were apparently in the District Attorney's file and the District Attorney had an open file discovery policy. Thus, despite defense investigators testimony that they never received copies of the logs, this court is not convinced counsel was unaware of the logs. Petitioner places heavy emphasis on the consent order entered into by the defense regarding certain items they had sought in previous discovery motions and hearings. He claims counsel inappropriately relinquished their right to receive police reports, police call sheets and police log reports. However, Tenn. R. Crim. P. 16 excludes the discovery or inspection of reports, memoranda or other internal state documents made by the district attorney general or state agents or law enforcement officers in connection with the investigation or prosecution of the case. . . . While some exceptions apply, case law has held that criminal defendants may not routinely have access to police personnel records under the rule; rather such records may only be discovered upon a strong showing that the personnel records might contain information material to a defendant's case. . . . This court does not find counsel would likely have met that standard in this case. Furthermore, for the reasons set out below this court does not find the evidence was discoverable based on its alleged exculpatory value. Therefore, any error on the part of counsel in failing to discover this material was not prejudicial.

Petitioner contends radio dispatch logs, recording calls regarding the events at the club on the evening in question, document two different calls relating to disturbances at the club. He claims the logs reveal that the first call was made by Officer Williams at 1:18 a.m. requesting assistance with a drunk and threatening black male occupying a burgundy Olds '98 and further indicates four cars responded to the call. He claims that the first car arrived at 1:24 a.m. and the last car cleared the scene at 2:01 a.m. Petitioner contends it is "undisputed" that Officer Marshall arrived at the club and encountered Petitioner after the responding cars had cleared the club. Thus, Petitioner contends

he was not detained by Marshall until sometime after 2:01 a.m. He argues that the time it took Officer Marshall to question him and release him and the time it took him to drive to Kimble's house and return to the scene would have been longer than thirty minutes. He further claims it is undisputed that Officer Williams was shot around 2:30 a.m. He claims this is demonstrated by the dispatch logs which reveal a civilian call reporting the shooting came in at 2:35 a.m. and internal police records indicating Officer Lee's "officer down" call came in at 2:32 a.m. and was placed after Officer Lee chased the suspect. Petitioner contends this proof obliterates the State's timeline and proves he could not have been the shooter. This court disagrees.

Although Officer Lee testified that another patrol unit responded to the scene prior to Officer Marshall arriving, he did not testify as to the time of either Officer's arrival. . . . Thus, it does not necessarily stand that the unit which responded was one of the four which were dispatched to the scene in response to the 1:18 a.m. call placed by Officer Marshall. The unit he witnessed could have been Officer Jackson, who testified that he was doing a drive through and had not actually been dispatched to the scene. Officer Marshall testified that he arrived at 12:30 a.m., but stated that was his best approximation. He also stated that when he arrived he spoke to Lee and Marshall and then went inside the club for approximately fifteen minutes. He indicated that when he left the club he had the encounter with Petitioner. Thus, it is possible Officer Marshall did not exit the club until after Williams placed the dispatch call at 1:18 a.m. Moreover, Officer Lee testified that during the time Marshall was outside with Williams he was inside the club. Thus, it is also possible Lee did not witness the arrival of the four responding cars because he was inside the club. Thus, the Marshall/McKinney encounter could have been completed long before 2:01, the time in which the logs indicate the last car cleared the scene.

Additionally, Donald Crump, the club's owner testified . . . that he had an altercation with a patron around 1:00 a.m., that he put the patron out of the club, and that Officer Marshall called from a car to respond, but later told them to disregard

because he, Crump, did not want the man arrested. Although Lee testified there were no other altercations that night, Crump did not mention speaking to Officer Lee about the altercation and it is possible Lee did not witness the altercation. Thus, it is also possible the 1:18 a.m. call to dispatch had nothing to do with Petitioner.

However, for purposes of this court's review, it will entertain Petitioner's argument. Accepting all of Petitioner's claims as true, this court still notes the State's time line is not defective. Assuming Officer Marshall did not arrive until after 2:01 a.m., it is still possible for Petitioner to have been briefly detained by Marshall, made the four and a half minute drive to Kimble's, and returned to the club a few minutes later to shoot Williams. Twenty-nine minutes was sufficient time to accommodate these events. More importantly strength of the State's case did not rely solely on a strict adherence to the proposed timeline.

Despite the "Consent Order," Mr. Ball made a general <u>Brady</u> motion for discovery and a motion for disclosure of impeaching information and a motion for production of exculpatory evidence. The Petitioner asserts that the State suppressed favorable evidence and misrepresented in the consent order that the dispatch logs, eyewitness statements, photo spread statements and police reports did not contain exculpatory information.

The Petitioner asserts that (1) Ms. Jeltz's photograph lineup statement in which she failed to identify the Petitioner as the shooter, (2) Mr. Lester's statement describing the shooter as wearing blue jeans and a blue shirt, and (3) Mr. Goin's statement failing to identify the Petitioner from a photo spread constituted exculpatory evidence favorable to the Petitioner. He contends that these statements undermine the testimony of the prosecution's two key eyewitnesses, Officer Lee and Joyce Jeltz. He continues that these statements provided varying descriptions of the shooter and revealed that eyewitnesses did not identify the Petitioner as the shooter.

The State asserts that the Petitioner was provided a copy of Joyce Jeltz's photographic lineup statement as the defense used the statement to cross-examine her extensively about the statement. Ms. Jeltz admitted that she could not identify the Petitioner in the photographs. Moreover, the Petitioner does not contend that he was never provided the statements of Mr. Lester and Mr. Goin. Rather, he contends that they were unavailable pretrial. Danese Banks testified that she interviewed each of these witnesses and learned of

the information about which the Petitioner now complains and passed this information on to counsel. "'[I]f the evidence in question is available to the defendant from other sources,'" Brady does not apply either directly or through investigation by a reasonable defendant. See Barnes v. Thompson, 58 F.3d 971, 975 (4th Cir. 1995); United States v. Wilson, 901 F.2d 378, 380 (4th Cir. 1990) (citations omitted). As Ms. Banks testified that she discovered this information through her investigation, there is no Brady violation. Moreover, it appears that the Petitioner suffered no prejudice by the failure of the State to turn these statements over prior to trial. Mr. Goin did not testify at the Petitioner's trial. The Petitioner failed to present testimony from Mr. Goin at the post-conviction hearing as to what his testimony would have been at trial.

The Petitioner complains that the dispatch logs established a timeline of events and supported an alibi charge. He asserts that the dispatch logs were exculpatory items withheld by the State. The trial court concluded that the dispatch logs were included in the District Attorney's file and that the District Attorney General had an "open file" policy regarding discovery. The trial court rejected the testimony of the investigators from Inquisitor, Inc., that they never received copies of the logs. The record supports the conclusions reached by the trial court. The Petitioner has failed to establish that the dispatch logs were withheld by the State. Additionally, the dispatch logs fail to refute the State's timeline of the case.

## B. Presentation of False Testimony

The Petitioner contends that the State "elicited, failed to correct, and emphasized in argument testimony it knew to be false." The Petitioner asserts that the following statements were false: Officer Marshall's testimony that he detained the Petitioner at 12:30 a.m., Officer Jackson's testimony that he went to the club on a routine cruise and Officer Lee's testimony that Officer Williams was not involved in other altercations, that the alley was well lit, and that the crowd left the club at 2:30 or 3:00 a.m.

The Petitioner argues that numerous witnesses presented at the post-conviction hearing testified to seeing altercations inside the club involving Officer Williams. He asserts that the State knew the testimony of Officer Lee was false, but relied upon the testimony to establish motive. The Petitioner cannot establish that Officer Lee knowingly testified falsely. There is no indication that Officer Lee was aware of the accounts witnessed by the club owner and the other patrons. Similarly, we reject the Petitioner's contention that Officer Lee presented false testimony when he stated that the alley was well lit. There is no proof other than conflicting opinions that the alley was well lit. The Petitioner has failed to establish that the prosecution knowingly presented false testimony.

## C. Mishandling of Physical Evidence

The Petitioner contends that the State failed to preserve and test evidence. He complains that the State did not preserve and test his car, his sweater, and the skid marks at the scene. The post-conviction court entered the following findings of fact and conclusions of law:

> . . .In particular, the Petitioner points to the handling of the following evidence: his 1988 Oldsmobile Delta 88 automobile that the State claimed he used to escape the scene; the tires belonging to said vehicle; the tire tracks left at the crime scene; Petitioner's sweater, hat, pants, jacket, t-shirt and shoes.
> . . .
> Testimony at the post-conviction hearing revealed that the Petitioner's car was in the custody and control of the State and was sold sometime prior to trial. However, it appears no testing was ever conducted regarding the tires on the vehicle. Likewise, it appears no testing was done on the interior of the vehicle to determine the presence of either blood or gun shot residue. Thus, despite Petitioner's argument to the contrary, . . . Ferguson does not apply, here, because no evidence was ever taken from the car. Thus, Petitioner's argument with regard to the car is without merit.
>
> Moreover, Petitioner's contention that the State mishandled the Petitioner's sweater, hat, pants, jacket, t-shirt and shoes is likewise without merit. Despite testimony that these items may have been inadvertently co-mingled, Petitioner failed to demonstrate the evidence was tainted by law enforcement officials. Testing of the items revealed there were particles consistent with gunshot residue on the vest worn by the Petitioner, but not on the other items of clothing. Again, the Petitioner is not entitled to relief merely because mishandling of evidence "may" have destroyed evidence favorable to the defense. This issue is without merit.

The Due Process Clause of the Fourteenth Amendment to the United States Constitution and Article I, section 8 of the Tennessee Constitution affords every criminal defendant the right to a fair trial. See Johnson v. State, 38 S.W.3d 52, 55 (Tenn. 2001). Accordingly, the State has a constitutional duty to furnish a defendant with exculpatory

-62-

evidence pertaining to the defendant's guilt or innocence or to the potential punishment faced by a defendant. See Brady, 373 U.S. at 87.

In State v. Ferguson, 2 S.W.3d 912, 914 (Tenn. 1999), our supreme court addressed the issue of when a defendant is entitled to relief when the state has lost or destroyed evidence that was alleged to have been exculpatory. The court explained that a reviewing court must first determine whether the state had a duty to preserve the lost or destroyed evidence. Id. at 917. Ordinarily, "the State has a duty to preserve all evidence subject to discovery and inspection under Tenn. R. Crim. P. 16, or other applicable law." Id. However,

> "[w]hatever duty the Constitution imposes on the States to preserve evidence, that duty must be limited to evidence that might be expected to play a significant role in the suspect's defense. To meet this standard of constitutional materiality, evidence must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means."

Ferguson, 2 S.W.3d at 917 (quoting California v. Trombetta, 467 U.S. 479, 488-89 (1984) (footnote and citation omitted)).

Ferguson also directs that if the proof demonstrates the existence of a duty to preserve the evidence and further shows that the State has failed in that duty, a court must proceed with a balancing analysis involving consideration of the following factors:

> 1. The degree of negligence involved;
> 2. The significance of the destroyed evidence, considered in light of the probative value and reliability of secondary or substitute evidence that remains available; and
> 3. The sufficiency of the other evidence used at trial to support the conviction.

Id. (footnote omitted). If the court's consideration of these factors reveals that a trial without the missing evidence would lack fundamental fairness, the court may consider several options such as dismissing the charges or providing an appropriate jury instruction. Id.

The Petitioner failed to present any proof at the post-conviction hearing that the failure to preserve the car or the skid marks or test the sweater was the result of gross negligence. Moreover, the existence of any potential exculpatory evidence is based solely

on speculation. The Petitioner has failed to delineate what sort of exculpatory evidence would have been revealed from a forensic evaluation of the Petitioner's vehicle. As noted by the State, the absence of bullet holes in the vehicle would not preclude an inference that Officer Lee did not shoot at the car. Similarly, the absence of gunshot residue on the sweater would not negate the presence of gunshot residue on the vest. He is not entitled to relief on this claim.

### III. EXCLUSION OF EYEWITNESS EXPERT

The Petitioner states that the exclusion of his eyewitness expert violated his due process rights to present a defense. He maintains that the only evidence placing the Petitioner at the shooting was the testimony of a witness who had seen him shortly before the shooting, the testimony of a witness who never positively identified him, and particles consistent with gunshot residue as likely as to have been transferred to his clothes through police mishandling of evidence. In support of his claim, the Petitioner relies upon our supreme court's holding in State v. Copeland, recognizing that the "exclusion of [eyewitness] expert testimony could violate [a defendant's] due process right to a fair trial if the excluded evidence was critical to the defense and was reliable." State v. Copeland, 226 S.W.3d 287, 297 (Tenn. 2007) (citing McKinney, 74 S.W.3d at 291).

In the direct appeal of the Petitioner's case, our supreme court recognized that the majority opinion of the court was that expert testimony on the issue of eyewitness identifications is per se inadmissible under Rule 702, Tennessee Rules of Evidence. See McKinney, 74 S.W.3d at 302 (citing State v. Coley, 32 S.W.3d 831 (Tenn. 2000)). In Coley, the opinion relied upon by the McKinney court, the supreme court rejected the appellant's argument that the trial court's exclusion of the eyewitness expert denied the appellant the right to present a defense. Coley, 32 S.W.3d at 838, n.14. The court held that when considering a due process violation the reviewing court must consider: (1) whether the excluded evidence was critical to the defense; (2) whether the evidence was sufficiently reliable for admission; and (3) whether the interest supporting exclusion of the evidence was substantially important. Id. (citation omitted). The court concluded that the expert testimony on eyewitness identification was not critical to Coley's defense. Id. Similarly, the supreme court in the Petitioner's direct appeal determined that the Petitioner had failed to show how the expert testimony was critical to his defense. McKinney, 74 S.W.3d at 302.

Four years after the decision in McKinney, the supreme court revisited the issue of expert testimony on the issue of eyewitness identifications. In State v. Copeland, the supreme court acknowledged that its decision in Coley was contrary to modern trends. See Copeland, 226 S.W.3d at 299. The court proceeded to overrule its holding in Coley that "no one, regardless of credentials or experience and no matter how questionable the evidence,

can provide testimony on the issue of eyewitness identification." Copeland, 226 S.W.3d at 300-01. In so holding, the court noted:

> In our view, it is far more likely for the jury to accredit the eyewitness than the expert. If eyewitness identification is a cornerstone of the criminal justice system, the jury is its foundation. It is also our view that the test in McDaniel is sufficient to allow the trial court to properly evaluate the admissibility of expert testimony on the reliability of eyewitness identification. To the extent that Coley holds otherwise, it is overruled. The essential role of the judge, as the neutral arbiter in the trial, is to govern the admission of the evidence within the rules, permitting only that expert testimony which substantially assists the jury in its consideration of the issue. The McDaniel test provides the trial judge with the necessary guidelines to properly exercise his or her discretion.

Copeland, 226 S.W.3d at 300.

In light of the holding in Copeland, the Petitioner contends that eyewitness expert testimony was critical to his defense as it could have assisted the jury in determining what weight to give identifications made by Mr. Lee and Ms. Jeltz. He argues that an expert could have explained to the jury that, while Officer Lee claimed to have "no doubt" about seeing the Petitioner, there were surrounding circumstances which indicated that his identification could be viewed with skepticism. He claims that absent the eyewitness expert evidence, he was deprived of the opportunity to provide an appropriate, admissible counterweight to their eyewitness testimony. The Petitioner further argues that whether the holding in Copeland is retroactive is not relevant to whether the Petitioner was denied due process by the exclusion of his eyewitness expert.

We agree we need not address the issue as to whether retroactive application of Copeland is required. The Petitioner failed to present any proof at the post-conviction hearing regarding expert eyewitness testimony. When a Petitioner contends that counsel failed to present witnesses in support of a defense, these witnesses should be presented by the Petitioner at the evidentiary hearing. See Black v. State, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990). Thus, this court must review the same facts and circumstances presented on direct appeal.

On direct appeal, this court reviewed the Petitioner's claim of error regarding the exclusion of an eyewitness expert. See State v. Timothy McKinney, No. W1999-00844-

CCA-R3-DD (Tenn. Crim. App. Mar. 28, 2001), aff'd by 74 S.W.3d 291 (Tenn. 2002). While this court applied the holding in Coley, stating that "Coley controls the evidentiary issue now before us," the court, nonetheless, continued to analyze the challenge as to whether the exclusion of the expert denied the Petitioner the right to a fair trial, noting that "due process of law precludes the use of rules of evidence to deny a criminal defendant a fair opportunity to present a defense." Id. slip op. at 7 (citation omitted). Although the court determined that "the Rules of Evidence are sufficient to protect the defendant's interest in a fair trial and his opportunity to present a defense," this court noted that even assuming error in the exclusion of the evidence, any error was harmless. This court determined that the excluded evidence was not critical to the Petitioner's defense. The court stated:

> The convicting evidence was strong, and although identity was an issue, the state's case was not totally dependent upon eyewitness identification testimony. The jury was shown that Ms. Jeltz could not positively identify the defendant as the offender. Officer Lee's ability to identify the offender *in situ* was greatly enhanced by the fact that he knew the defendant based upon his recent personal conversations with him. The opportunity for misidentification in that situation is not as great as it would be in a case where the eyewitness observes an offender who is a stranger and then attempts to identify him later. Furthermore, the trial court gave the Dyle instruction to the jury. See State v. Dyle, 899 S.W.2d 607, 612 (Tenn. 1995) (prescribing instructions, when identity is a material issue, that would inform the jury about factors to use in evaluating eyewitness testimony and reminding them of the state's burden of proving identity beyond a reasonable doubt). These circumstances in the present case belie any concern that the proposed evidence was critical. . . .

Id. slip op at 8.

The general rule is that "questions regarding the admissibility, qualifications, relevancy and competency of expert testimony are left to the discretion of the trial court." Copeland, 226 S.W.3d at 301 (citing McDaniel v. CSX Transp., Inc., 955 S.W.2d 257, 263 (Tenn. 1997) (citing State v. Ballard, 855 S.W.2d 557, 562 (Tenn.1993))). A decision by the trial judge to admit or exclude expert testimony "may only be overturned if the discretion is arbitrarily exercised or abused." McDaniel, 955 S.W.2d at 263-64. Further, the admission of expert proof is governed by Tennessee Rules of Evidence 702 and 703. Brown v. Crown Equip. Corp., 181 S.W.3d 268, 273 (Tenn. 2005). Rule 702 provides as follows:

> If scientific, technical, or other specialized knowledge will <u>substantially assist the trier of fact to understand the evidence or to determine a fact in issue</u>, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise.

Tenn. R. Evid. 702 (emphasis added).

This court is without the benefit of any proof as to the nature of the proposed expert testimony and the need for such testimony in the present case. Neither was such proof available to the courts on direct appeal. See McKinney, 74 S.W.3d at 302. Absent proof by the Petitioner and considering the evidence presented at trial, we conclude that there was no error in the exclusion of the testimony of an expert on eyewitness identification. The Petitioner is not entitled to relief on this claim.

## IV. DEATH SENTENCE IS UNCONSTITUTIONAL

The Petitioner raises numerous challenges to the constitutionality of the imposition of the death penalty. The State responds that these challenges have previously been considered and rejected by the appellate courts of this state.

### A. Tennessee Death Penalty Regime is Unconstitutional

The Petitioner asserts that the death penalty is imposed in an arbitrary and capricious manner resulting in the violation of the Petitioner's rights guaranteed under both the federal and state constitutions. Specifically, he argues that the failure to adopt any statewide guidelines or procedures for pretrial judicial review of prosecutorial discretion has given prosecutors unfettered discretion in choosing whether to seek a death sentence. In support of his allegation the Petitioner relies upon a recent study commissioned by the American Bar Association Death Penalty Moratorium Implementation Project.

The Petitioner's claims that unlimited discretion is vested in the prosecutor as to whether or not to seek the death penalty and that the death penalty is imposed in a discriminatory manner based upon economics, race, geography, and gender have been repeatedly rejected by the courts of this state. See State v. Hines, 919 S.W.2d 573, 582 (Tenn. 1995); State v. Brimmer, 876 S.W.2d 75, 87 (Tenn. 1994); State v. Cazes, 875 S.W.2d 253, 268 (Tenn. 1994); State v. Smith, 857 S.W.2d 1, 23 (Tenn. 1993). Additionally, the Petitioner raised this claim on direct appeal. See McKinney, 74 S.W.3d at 320. Accordingly, the claim has been "previously determined" pursuant to Tennessee Code Annotated section 40-30-106(h).

The Petitioner also contends that the state of Tennessee applies an unconstitutionally high burden of proof in ineffective assistance of counsel claims in violation of the Sixth Amendment. Specifically, he argues that the clear and convincing standard applied in Tennessee is "diametrically different" to the standard established in Strickland v. Washington.

Our supreme court rejected this argument in its recent decision in Dellinger v. State, 279 S.W.3d 282 (Tenn. 2009). The state's supreme court held that the requirement to prove allegations by clear and convincing evidence, see Tennessee Code Annotated section 40-30-110(f), does not implicate the Strickland inquiry. Dellinger, 279 S.W.3d at 293. The court explained that, if the Petitioner established his allegations by clear and convincing evidence, then the reviewing court must then assess under Strickland whether that error "fell below an objective standard of reasonableness" and whether the error raised "a reasonable probability . . . the result of the proceedings would have been different." Id. at 294 (citing Strickland, 466 U.S. at 687-94). Accordingly, nothing in section 40-30-110(f) obviates or adds to the two prongs of deficiency and prejudice as set forth in Strickland. Rather, the statute merely provides an evidentiary standard by which the Petitioner must establish the existence of the facts underlying his allegations. Tennessee adheres to the Strickland framework. The Petitioner is not entitled to relief as to this claim.

## B. The Petitioner's Sentence of Death Violates International Law

The Petitioner next contends that Tennessee's imposition of a death penalty violates treaties of the United States and, hence, the federal constitution's Supremacy Clause. The Petitioner contends that the Supremacy Clause was violated when his rights under treaties and customary international law to which the United States is bound were disregarded. Arguments that the death penalty is unconstitutional under international laws and treaties have systematically been rejected by the courts. See State v. Odom, 137 S.W.3d 572, 600 (Tenn. 2004); see also Medellin v. Texas, 552 U.S. ___, 129 S. Ct. 360 (2008) (holding that international treaty is not binding domestic law unless Congress enacts statutes implementing it or unless the treaty is self-executing and that decisions of the International Court of Justice are not binding domestic law). We discern no viable reason to resolve this issue in a different manner in this case. The Petitioner is not entitled to relief on this issue.

## C. Lethal Injection Violates the United States and Tennessee Constitutions and International Law

Petitioner asserts that execution by the means of lethal injection violates his rights to be free from cruel and unusual punishment. The Tennessee Supreme Court has considered this claim and determined that Tennessee's lethal injection protocol is consistent with

contemporary standards of decency and with the overwhelming majority of lethal injection protocols used by other states and the federal government. Abdur' Rahman v. Bredesen, 181 S.W.3d 292, 306-07 (Tenn. 2005), cert. denied. On April 16, 2008, the United States Supreme Court affirmed the use of the three-drug protocol used in Kentucky's lethal injection procedure. Baze v. Rees, 553 U.S. 35 (2008). Tennessee uses the same protocol as Kentucky. Id. (citing Workman v. Bredesen, 486 F.3d 896, 902 (6th Cir. 2007)); see Harbison v. Little, 571 F.3d 531 (6th Cir. 2009), cert. denied, ___ U.S. ___ (2010). The Petitioner is not entitled to relief on this issue.

### D.  Tennessee's Proportionality Statute is Unconstitutional

The Petitioner asserts that his due process and equal protection rights are jeopardized by the invalid application of Tennessee's statute governing proportionality review of death sentences. The Petitioner's arguments have been rejected by the courts of this state. See State v. Vann, 976 S.W.2d 93, 118-19 (Tenn. 1998); Cazes, 875 S.W.2d at 270-71. Moreover, our supreme court has held that, "[w]hile important as an additional safeguard against arbitrary or capricious sentencing, comparative proportionality review is not constitutionally required." State v. Bland 958 S.W.2d 651, 663 (Tenn. 1997). Accordingly, the Petitioner is not entitled to relief on this claim.

### E.  The Indictment Against the Petitioner Failed to Allege a Capital Offense

The Petitioner asserts that his sentence of death violates the due process clause, article I, section 8 of the Tennessee Constitution and the Fourteenth Amendment to the United States Constitution. Relying upon Apprendi v. New Jersey, 530 U.S. 466 (2000), he argues that his indictment was flawed because the aggravating circumstance which made him eligible for the death penalty was not submitted to the grand jury nor returned in the indictment. The Petitioner's argument is based upon the premise that first degree murder is not a capital offense unless accompanied by aggravating factors. Thus, he alleges that to satisfy the requirements of Apprendi, the indictment must include language of the statutory aggravating circumstances to elevate the offense to capital murder. This argument has been rejected by our supreme court. See State v. Rollins, 188 S.W.3d 553 (Tenn. 2006); State v. Holton, 126 S.W.3d 845 (Tenn. 2004); see also State v. Berry, 141 S.W.3d 549, 558-62 (Tenn. 2004). The Petitioner is not entitled to relief on this claim.

### F.  Offer of a Guilty Plea Was Unconstitutional

Before trial, the State offered the Petitioner a sentence of life without the possibility of parole in exchange for a guilty plea. The Petitioner now asserts that this attempt by the state to circumvent the Petitioner's constitutional rights renders his death sentence

unconstitutional. Specifically, he asserts that a defendant cannot be forced to sacrifice his constitutional rights to avoid the death penalty. See United States v. Jackson, 390 U.S. 570, 581 n.20 (1968). This same issue has been rejected by our supreme court in State v. Mann, 959 S.W.2d 503, 511 (Tenn. 1997). The Petitioner is not entitled to relief on this claim.

## CONCLUSION

Counsel's constitutionally deficiencies throughout the representation of the Petitioner establish cumulative prejudice of such magnitude that we conclude that the Petitioner's right to a fair proceeding was prejudiced. There is a reasonable probability that, absent their deficiencies, the outcome of both the guilt phase and the sentencing phase of the trial would have been different. The nature and extent of counsel's deficiencies rendered the entire proceeding fundamentally unfair. Accordingly, upon review of the entire record, we conclude that the evidence preponderates against the findings of the post-conviction court. Considering the prejudice resulting from counsel's deficiencies in their representation in both the preparation and trial of this case, we reverse the judgment of the lower court denying post-conviction relief for this offense, and a new trial is granted.

_____
JOSEPH M. TIPTON, PRESIDING JUDGE